**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Efren Pangilinan SANGA,
Defendant–Appellant.**

**No. 91–10455.**

United States Court of Appeals,
Ninth Circuit.

Submitted June 12, 1992.[*]

Decided June 22, 1992.

---

[*] The panel unanimously found this case suitable for decision without oral argument. Fed. R.App.P. 34(a) and Ninth Circuit Rule 34–4.

Pablo M. Aglubat, Agana, Guam, for defendant-appellant.

Karon V. Johnson, Asst. U.S. Atty., Agana, Guam, for plaintiff-appellee.

Before: BROWNING, PREGERSON, and ALDISERT,** Circuit Judges.

PREGERSON, Circuit Judge:

Efren Pangilinan Sanga appeals an order of restitution imposed as part of his sentence following entry of guilty pleas to conspiracy to smuggle aliens, in violation of 8 U.S.C. § 1324(a)(1)(D) and 18 U.S.C. § 371, and unlawful procurement of citizenship, in violation of 8 U.S.C. § 1425. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

I

Status of Annie Marie Quinlob
as a "Victim"

Sanga contends that the person to whom he was ordered to pay restitution, Annie Marie Quinlob, is not a "victim" within the meaning of the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. §§ 3663, 3664 (formerly codified at 18 U.S.C. §§ 3579, 3580), and is not entitled to restitution. Sanga argues that because Quinlob was a willing participant in the conspiracy to smuggle herself into Guam, she could not be at the same time a victim

** The Honorable Ruggero Aldisert, Senior Circuit Judge for the Third Circuit, sitting by designation.

of that conspiracy. This argument lacks merit.

■ We review de novo both the legality of a restitution order, *United States v. McHenry*, No. 90–10423, slip op. 5691, 5695, 1991 WL 340282 (9th Cir. May 19, 1992), and the district court's conclusion that a person is a victim for purposes of the VWPA, *United States v. Salcedo–Lopez*, 907 F.2d 97, 98 (9th Cir.1990) (governmental entity not a victim which suffered a loss under VWPA when it voluntarily paid for contraband during investigation of crime); *United States v. Ruffen*, 780 F.2d 1493, 1496 (9th Cir.) (governmental entity which paid out benefits to defendant as result of fraudulent scheme is victim for purposes of VWPA), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986).

The VWPA provides that "[f]or the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663. The Supreme Court has held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990).

In *McHenry*, this court addressed the legality of a restitution order in the context of a conviction for conspiracy. *McHenry*, slip op. at 5694. The *McHenry* defendants operated a fraudulent coin sales business and were convicted of conspiracy to commit mail and wire fraud. The district court awarded restitution to all persons who were identified as "customers" of the coin sales business and who desired a refund, *id.* at 5695, despite the fact that the jury did not specify which overt acts the defendants committed in furtherance of the conspiracy, *id.* at 5697. After first finding that there could be "victims" of a conspiracy such that restitution under the VWPA could be ordered, *id.* at 5696–98, this court

went on to vacate the order of restitution because "*Hughey* requires that restitution must be limited to the loss flowing from the conspiracy itself. Therefore, to remain within these boundaries, the loss must result from the act or acts done in furtherance of the conspiracy...." *Id.* at 5698; *see also United States v. Sharp*, 941 F.2d 811, 815 (9th Cir.1991) ("[e]ven when the offense of conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction").

■ Here, Count 1 of the indictment alleged a conspiracy "to smuggle numerous illegal and unauthorized aliens into the United States from the Philippines by encouraging and inducing the aliens to come to, enter and reside in the United States." The object of this conspiracy was to "bring family members, friends, and workers into Guam for purposes of unlawful employment, the harboring of illegal aliens within the United States, and to circumvent the Immigration and Nationality Act and regulations pertaining thereto concerning the lawful admission of aliens."

Quinlob was not named as a conspirator in the indictment. The overt acts of the conspiracy in which Quinlob was actively involved were limited solely to the mechanics of the conspiracy's successful attempt to smuggle her into Guam. Consistent with the object of the conspiracy identified in the indictment, however, Sanga stipulated in his plea agreement that he smuggled Quinlob in specifically for the purpose of employing her as his live-in maid.

When Quinlob arrived in Guam at Sanga's house, she had her passport and a return airline ticket to the Philippines. The following day, Sanga told her that she would have to work for him as a maid, and when Quinlob stated that she wished to go home to the Philippines, Sanga told her he had spent a lot of money to bring her to Guam and he would kill her before he would allow her to return to the Philippines. Soon thereafter, Quinlob discovered that her passport and airline ticket had disappeared from under her mattress where she had hidden them. The passport

was eventually found under Sanga's mattress by an INS agent during the execution of a search warrant on the Sanga residence.

Sanga and his wife employed Quinlob as a live-in maid, working approximately fourteen hours a day, seven days a week, for the substandard wage of $150.00 per month. After about two years working as a maid for the Sangas, Quinlob gave in to pressure from Sanga and agreed to have sex with him in return for his providing her with a false Guam identification card so that she could obtain employment outside the Sanga home. While she was in Guam, she left her child in the Philippines under the joint care of Raoul Flores, the baby's father and also Sanga's brother-in-law, and a personal friend identified as Maryann Manabat.

Notwithstanding Sanga's unsupported assertion that Quinlob "was prepared to risk any inconveniences to continue to conceal her illegal status as an alien in the hope of reaping the benefits which motivated her illegal entry into Guam," there is no evidence in the record that Quinlob volunteered to be kept as a virtual slave of the Sangas for almost two years. On the contrary, the evidence introduced at the sentencing hearing demonstrates that Sanga threatened Quinlob's life if she did not work for him, and that he forced her to have sex with him before he arranged for her to get a false Guam identification card so that she could work outside of the Sangas' house. Any criminal complicity in the conspiracy which Quinlob might bear stopped at the point at which she became the object of, rather than a participant in the criminal goals of the conspirators.[1]

This case is distinguishable from both *McHenry* and *Sharp* because the record in those cases showed that restitution was ordered for conduct not specifically addressed in the counts of conviction. *See McHenry*, at 5697; *Sharp*, 941 F.2d at 814–

15. The record in this case shows that Sanga conspired to bring Quinlob from the Philippines to Guam in order to obtain a low-cost, live-in maid who would be unable to object to the conditions of her employment or Sanga's sexual advances. Quinlob's lost wages were the direct consequence of Sanga's conspiracy to smuggle her into Guam from the Philippines for purposes of that illegal employment, and as such "flow[ ] from the conspiracy itself." *See McHenry*, at 5698.

## II

### Imposition of Several Liability

Sanga contends the district court erred by imposing on him several liability for the amount of restitution ordered as part of his sentence. Sanga claims that it is unclear whether the district court intended that a total of $21,787.20 from all defendants would be awarded as restitution to Quinlob or whether that amount was merely a portion of the total amount of restitution to be awarded. This claim lacks merit.

■ We review for abuse of discretion a restitution order which is within the statutory framework. *Sharp*, 941 F.2d at 814; *United States v. Van Cauwenberghe*, 827 F.2d 424, 434 (9th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988). The VWPA provides that "[t]he court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation...." 18 U.S.C. § 3663(e)(1).

■ The district court calculated that Quinlob was underpaid by $61,406.28 during her more than two years of service as a live-in maid to the Sangas. Sanga offers no more than an unsupported allegation that the district court found that the entire amount of restitution due Quinlob for her two years of service was limited to $21,-787.20.[2] Sanga conceded at the sentencing

---

1. For this reason, Sanga's reliance on *United States v. Weir*, 861 F.2d 542 (9th Cir.1989), is misplaced. Although in that case we implied in dicta that it might be improper to consider a participant in a crime as a victim of that crime, *id.* at 546, Quinlob did not willingly participate

in the criminal behavior by which she was victimized.

2. Based on this allegation, he points to the judgment order from his codefendant wife's sentencing, in which she too was ordered to pay $21,-

hearing that the amount of underpayment for one year of Quinlob's labor was properly set at $21,787.20. There was no dispute below, nor is there any dispute on appeal, that Quinlob worked for the Sangas for approximately two years.

■ Accordingly, the district court did not abuse its discretion by ordering Sanga to be severally liable for the entire amount of lost wages due Quinlob for only one of her two years of work as a live-in maid. *See Van Cauwenberghe*, 827 F.2d at 435.

## III

### Offset

■ Sanga contends the district court erred by not awarding him an offset from the total amount of restitution he was ordered to pay Quinlob. Sanga argues that the cost of his family's services in taking care of Quinlob's baby in the Philippines while Quinlob was in Guam should be deducted from the amount of restitution ordered. Sanga failed to raise this factual issue of offset below and we decline to address it on appeal. *See United States v. Smith*, 905 F.2d 1296, 1302 (9th Cir.1990).

## IV

### Schedule of Payment

Sanga contends the district court erred by requiring him to pay $5,000.00 of the amount of the restitution order within 30 days of judgment. He argues that he would only have been able to pay the $5,000.00 immediately if he was granted probation rather than sentenced to a term of incarceration and that the district court was aware of this fact when it imposed the immediate payment requirement on him. This contention lacks merit.

■ Although we review for abuse of discretion an order of restitution which is within the statutory limits of the VWPA, factual findings underlying the order of restitution are reviewed for clear error. *United States v. Smith*, 944 F.2d 618, 623 (9th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992).

■ Under the VWPA, the district court " 'shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.' " *Id.* (quoting 18 U.S.C. § 3664(a)). The district court abuses its discretion when it fails to consider the defendant's ability to pay the order of restitution. *Id.* Nonetheless, "it is not required to discuss the [relevant] factors with the defendant on the record." *United States v. Grewal*, 825 F.2d 220, 223 (9th Cir.1987).

■ Here, the district court had before it in the presentence report a complete accounting of Sanga's financial status. Sanga and his wife had combined assets of $162,000.00 and liabilities of $86,740.00. In addition, Sanga's counsel at the sentencing hearing represented that members of Sanga's family had assured him that they would provide Sanga with $5,000.00 as an initial payment on the restitution order amount if they were given thirty days to do so. Contrary to Sanga's claim on appeal, it is clear from the sentencing transcript that the offer to pay the initial $5,000.00 within 30 days was made prior to and apart from any discussion regarding the possibility of granting Sanga a probationary sentence.

In light of the evidence the district court had before it at the sentencing trial, the district court did not clearly err by finding that Sanga was capable of making an initial $5,000.00 restitution payment within 30

787.20 in restitution, and claims that Quinlob will thereby receive a double recovery under the VWPA. However, exhibits and documents not filed in the district court or admitted into evidence are not a part of the appellate record.

Fed.R.App.P. 10(a); *United States v. Sanchez-Lopez*, 879 F.2d 541, 548 (9th Cir.1989). Accordingly, we do not consider the judgment and sentencing order of Elvira Sanga in ruling on this matter. *See id.*

days of judgment. *See Smith*, 944 F.2d at 623.

AFFIRMED.