**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3701
_____

UNITED STATES OF AMERICA

v.

DNYANOBA KENDRE,
AKA Ken Kendre,

                              Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 1-08-cr-00071-001)
District Judge: Honorable Sylvia H. Rambo

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 29, 2012
_____

Before:  SLOVITER, CHAGARES, and JORDAN, <u>Circuit Judges</u>.

(Filed: July 2, 2012)
_____

OPINION
_____

CHAGARES, <u>Circuit Judge</u>.

     This appeal challenges an award of restitution made pursuant to the Mandatory

Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  Appellant Dnyanoba Kendre

pleaded guilty on September 13, 2010 to visa fraud and money laundering.  His sentence

included an order of restitution. Kendre argues on appeal that the restitution award was improper because the recipient of the restitution, Dr. Nilkamal Karelia, was a coconspirator rather than a victim and did not suffer harm as a result of the offenses of conviction. Kendre also challenges the method by which the District Court calculated the restitution award. Finding no merit in these arguments, we will affirm.

I.

We write solely for the parties' benefit and recite only the facts essential to our disposition.

Kendre is the president of Global Empire, LLC, a Pennsylvania-based corporation specializing in physician, nursing, and rehabilitative services. From October 2003 through November 2007, Global employed foreign workers through the H-1B visa program, a Government program that enables employers to hire temporary workers in specialty occupations for prescribed periods of time. See 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(1)(ii)(B), (4)(i). To bring H-1B workers into the United States, Kendre was required to complete a number of certifications and applications and file them with relevant Government agencies.

This case involves four foreign workers hired by Kendre to work at Global: Rajeev Gupta, Nilkamal Karelia, Navinchandra Patel, and Sadia Ijaz. Kendre employed each worker through the H1-B program. At some point, Kendre became dissatisfied with his employees' performance and informed them that they should seek alternative work. Firing them without transferring their H-1B visas to another H-1B employer, however, would jeopardize their immigration status and their ability to apply later for green cards.

2

When the employees were unable to find work with other H-1B employers, Kendre arranged to represent to the Government that they remained on his payroll at Global, even though in fact they no longer worked for him. He completed and submitted to Government agencies a number of visa applications that contained false statements about the workers' employment status.

To make it seem as though the workers remained on his payroll, Kendre instructed them to transfer salaries they earned from employment at non-H-1B employers to his personal account. Kendre then siphoned off some portion of their payments, transferred the money to Global's corporate account, and directed Global to generate payroll checks for the employees. In this way, he laundered money to bolster his false representations to the Government that the workers remained employed by Global.

At issue in this appeal is Kendre's relationship with Karelia, a citizen of India who was hired by Global in 2004 to work as the director of a new nursing school Kendre planned to open. Karelia paid Kendre $10,000 to complete the paperwork necessary to obtain an H-1B visa. Once the visa was processed and Karelia began work, Kendre paid him less than the prevailing wage — that is, the salary Kendre was obligated by law to pay given his representations to the Government regarding Karelia's education and experience. Although Karelia was hired on the understanding that he would devote his efforts to opening the school and establishing a tissue bank, Kendre also ordered him to work part-time and on weekends at a dollar store owned by Global. He paid Karelia no additional salary for the dollar store duties. When Kendre informed Karelia in March 2005 that the nursing school was unprofitable and that his director position would be

eliminated, Kendre offered to keep Karelia on as a full-time employee at the dollar store, earning $7 per hour. Karelia declined, for the salary would not support his family, who had since moved to the United States. Kendre terminated Karelia, who later used family savings to open a grocery store in Pennsylvania.

Some time after Kendre terminated Karelia, he suggested that Karelia could maintain his H-1B status by remitting his salary earned from the grocery store to Kendre's personal account. Kendre represented that he would deduct sums equivalent to employee and employer payroll taxes and issue the difference to Karelia as a payroll check from Global. Feeling that his tenuous immigration status left him no choice but to participate in the scheme, Karelia agreed. From that point until November 2007, Karelia rerouted his grocery store earnings to Kendre and Global. Kendre continued filing forms with the Government representing that he employed Karelia as a medical science professional and that he paid him $53,000 per year.

A Government investigation uncovered Kendre's scheme in November 2007. Kendre eventually agreed to waive his right to indictment by a grand jury and to plead guilty to a felony information charging him with one count of visa fraud in violation of 18 U.S.C. § 1546 and one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The victim impact portion of the presentence report indicated that Karelia had requested, and was entitled to, $237,670.00 in restitution. After holding three sentencing hearings and considering testimony from a number of witnesses, including Karelia, the District Court sentenced Kendre to 21 months in prison followed by three years of supervised release. The court also ordered Kendre to make restitution to Karelia

4

in the amount of $100,102.00.  The District Court calculated the award of restitution for 2004 and 2005 by subtracting the salary Kendre actually paid Karelia from the annual prevailing wage.  For 2006 and 2007, the District Court awarded Karelia the difference between his payments to Kendre and the amounts Kendre refunded to him in Global paychecks.  The court added to the sum of these values the $10,000 Karelia unlawfully paid Kendre to process the H-1B application.

Kendre filed this timely appeal to challenge the restitution award.[1]

## II.

The MVRA requires the District Court to order restitution in criminal cases where the offense is "an offense against property . . . , including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), and where "an identifiable victim . . . has suffered a . . . pecuniary loss," id. § 3663A(c)(1)(B).  A "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  Id. § 3663A(a)(2).  Kendre maintains that Karelia does not qualify as a "victim" under the MVRA.  Any harm suffered by Karelia, Kendre contends, was not directly and proximately caused by his criminal conduct.  Moreover, he argues, Karelia is an unindicted coconspirator, not entitled to restitution for wrongdoing in which he actively participated.

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).  "We review *de novo* whether restitution is permitted by law and the amount of the award for abuse of discretion."  United States v. Bryant, 655 F.3d 232, 253 (3d Cir. 2011).

5

The MVRA permits victims restitution only for crimes for which the defendant is convicted. 18 U.S.C. § 3663A(1)(A). Kendre maintains that Karelia did not suffer losses that were directly and proximately caused by his visa fraud offense. This argument ignores the fact that Kendre also pleaded guilty to money laundering and admitted returning to Karelia less income than he received from him, for a span of years. The difference between those two values is a pecuniary loss to Karelia. The loss was caused, both directly and proximately, by Kendre's movement of money from Karelia, to his own personal account, through his corporate accounts, and back to Karelia.

Kendre's second submission is that Karelia is not entitled to restitution because he was effectively an unindicted coconspirator. The Courts of Appeals for the Second and Ninth Circuits interpret the MVRA to mandate restitution only for true victims of a crime, not for coconspirators who happen also to be victims. United States v. Lazarenko, 624 F.3d 1247, 1251-52 (9th Cir. 2010); United States v. Ojeikere, 545 F.3d 220, 222 (2d Cir. 2008); United States v. Reifler, 446 F.3d 65, 127 (2d Cir. 2006). These courts recognize that the MVRA defines victimhood by reference to harm, not by reference to ignorance of or complicity in an offense. Lazarenko, 624 F.3d at 1250. However, they reason that Congress could not have intended for federal courts to engage in redistribution of restitutionary payments amongst joint perpetrators of an offense when it enacted the MVRA. Id. at 1251; Reifler, 446 F.3d at 127.

Assuming, without deciding, that this is a sound interpretation of the MVRA,[2] Kendre's argument that Karelia is a coconspirator nevertheless fails. To support his theory, he cites four decisions of other Courts of Appeals that involve defendants convicted of conspiracy offenses. See United States v. Archer, 671 F.3d 149, 154 (2d Cir. 2011) (defendant convicted of conspiracy to commit visa fraud); Lazarenko, 624 F.3d at 1248 (defendant convicted of conspiracy to commit money laundering); Reifler, 446 F.3d at 70 (defendant convicted of racketeering conspiracy); United States v. Sanga, 967 F.2d 1332, 1333 (9th Cir. 1992) (defendant convicted of conspiracy to smuggle aliens). These decisions are inapt, for Kendre was neither charged with nor convicted of a conspiracy offense. His convictions are on substantive counts charging individual

_____

[2] The Lazarenko opinion declared that it is "exceedingly rare" that a person might be both a victim and a coconspirator and that the very question of whether one can be both is "bizarre," 624 F.3d at 1250, but this case highlights how the problem may come up, and come up repeatedly, in the immigration context. Thus, while both Reifler and Lazarenko reason that it would constitute "an error. . . fundamental and . . . adversely reflecting on the public reputation of . . . judicial proceedings" to suggest that Congress intended to allow courts to award restitution to coconspirators, Reifler, 446 F.3d at 127; Lazarenko, 624 F.3d at 1251, it may well be that Congress did foresee circumstances where that would be appropriate. Indeed, this case provides a compelling example of how such a circumstance might arise. Under difficult circumstances, Karelia participated in Kendre's fraudulent scheme. The Government might have chosen to prosecute him and others on Kendre's false payroll as coconspirators, though we do not suggest it should have. Had it done so, we would face precisely the victim-coconspirator conundrum that our sister circuits think so outlandish as to be unthinkable. It is not at all clear to us, however, that, if someone in Karelia's position were charged with conspiracy, it would be absurd to read the MVRA as allowing him to recover restitution. In other words, not all coconspirators are created equal; some may be "wholly guilty," Lazarenko, 624 F.3d at 1251, and some far less so. Cf. id. (holding that a "literal application of the plain text [of the MVRA] leads to absurd results," because "Congress could not have intended" that "federal courts would be involved in redistributing funds among wholly guilty co-conspirators, where one or more co-conspirators may have cheated their comrades"). However, we leave for another day the question of whether the concepts of "victim" and "coconspirator" must generally be viewed as mutually exclusive, as other courts have concluded.

misconduct. Without having admitted that he knowingly agreed to join a conspiracy, Kendre can hardly claim to have coconspirators.

Kendre also likens participants in or beneficiaries of wrongdoing to coconspirators, contending that they too are not entitled to restitution. We are unconvinced that Karelia's minor participation in Kendre's visa fraud and money laundering activities, and the benefit he derived therefrom, justifies reading such an exception into the MVRA. The District Court concluded, and we agree, that Karelia's participation did not drive Kendre's criminal conduct. Kendre conceived of the scheme, directed its operation, and benefitted financially from the money laundering, either by retaining portions of Karelia's salary in his personal account or by massaging his tax liability. And while Karelia welcomed preservation of his H-1B status, he also suffered monetary loss.

Kendre's final challenge to the award contests the method by which the District Court calculated the restitution owed to Karelia. The District Court erred, in Kendre's view, by awarding Karelia restitution for the period after he was terminated by Global. Kendre characterizes this portion of the award as excessive, arguing that Karelia's income at that point should have derived exclusively from his grocery store. The argument misunderstands the nature of the restitution awarded for 2006 and 2007. The District Court awarded Karelia only the difference between his earnings from the grocery store and the amount he received back from Kendre post-laundering. It was not an abuse of discretion, we conclude, for the District Court to measure Karelia's pecuniary losses in part by reference to that gap in earnings.

8

III.

For the reasons stated, we will affirm the judgment of the District Court.