**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 10 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MAC DEWAYNE OVERHOLT and
KOTESWARA ATTALURI,

Defendants-Appellants.

Nos. 00-5074 and 00-5081

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NOS. 98-CR-161-004-C, 98-CR-161-001-C)**

---

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant Attaluri.

Michael G. Katz, Federal Public Defender, and James P. Moran, Assistant Federal Public Defender, Denver, Colorado, on the brief for Defendant-Appellant Overholt.

Todd S. Aagaard, Attorney, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Plaintiff-Appellee in Case No. 00-5081 (John C. Cruden, Acting Assistant Attorney General, Washington, D.C., David E. O'Meilia, United States Attorney, Kevin Leitch, Assistant United States Attorney, Tulsa, Oklahoma, John A. Bryson and Andrew D. Goldsmith, Attorneys, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., with him on the brief in both cases).

---

Before **EBEL** , **BALDOCK** , and **HARTZ** , Circuit Judges.

_____

**HARTZ** , Circuit Judge.

_____

**Introduction.**

Defendant Koteswara Attaluri was president of Allied Environmental Services (Allied), which was hired to take petroleum-impacted wastewater from several Department of Defense installations and dispose of it properly. Allied employed Overholt Trucking, owned by Defendant DeWayne "Mac" Overholt, to perform hauling incident to the project. The gist of the charges against Defendants is that they unlawfully injected the wastewater into disposal wells and tried to cover up their crimes.

Allied, Attaluri, and Overholt were convicted under 18 U.S.C. § 371 on a charge that they entered into a conspiracy with five objects: (1) improperly disposing of petroleum-impacted wastewater, in violation of the Safe Drinking Water Act (SDWA), 42 U.S.C. §§ 300h, et seq.; (2) transporting hazardous wastes without a manifest, in violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(d)(1); (3) using the mails in the commission of a fraud, in violation of 18 U.S.C. § 1341; (4) using interstate wire communications in the commission of a fraud, in violation of 18 U.S.C. § 1343; and (5) defrauding

the United States by obstructing the lawful environmental protection functions of the Environmental Protection Agency (EPA) and the Department of Defense. In five special verdicts, the jury found that they conspired to commit each of the alleged objects of the conspiracy.

All three were also convicted of a substantive count of mail fraud. In addition, Overholt was convicted on two counts of discharging a pollutant into United States waters, in violation of the Clean Water Act (CWA), 33 U.S.C. §§ 1311(a), 1319(c)(2)(A); one count of illegally transporting hazardous waste, in violation of the RCRA; and one count of making false statements to the federal government in the course of an investigation, in violation of 18 U.S.C. § 1001. Although Allied and Attaluri were also charged on the two CWA counts, they were acquitted. Co-defendant Gary Bicknell, an Allied employee, was acquitted of all charges against him. Attaluri was sentenced to a 55-month prison term; Overholt received an 87-month sentence. Each was ordered to pay restitution of $1,265,078.

Attaluri and Overholt raise numerous issues on appeal. (Allied did not appeal.) Attaluri claims that the jury instructions (1) did not accurately set forth the law regarding what wastes could be injected into the disposal wells used by Defendants, (2) misled the jury regarding what constitutes hazardous waste, and (3) improperly indicated that the offense of defrauding the United States did not

require an intent to deceive. He also claims he was entitled to instructions that (4) the SDWA imposes criminal sanctions only on those who know the law they are violating and (5) the SDWA does not impose criminal penalties for violations committed in good faith ignorance of the law. In addition, Attaluri raises several challenges to the sufficiency of the evidence to support his conspiracy and mail fraud convictions; and Overholt challenges the sufficiency of the evidence to support any of his convictions except making false statements.

Both Defendants also claim various errors regarding their sentences. Attaluri contends on several grounds that the restitution award was improper and excessive, and complains that the district court did not set a payment schedule. He also contests two factors used to enhance his sentence under the United States Sentencing Guidelines, contending that the district court miscalculated the loss from fraud when applying U.S.S.G. § 2F1.l and should not have applied U.S.S.G. § 2Q1.2(b)(1)(A), because the waste was not discharged into the environment and did not contaminate the environment. Overholt contends that the district court improperly enhanced his sentence under U.S.S.G. § 3B1.1(a) for his role as an "organizer or leader of a criminal activity" and improperly considered two misdemeanors when determining his criminal history category.

Attaluri and Overholt appealed separately. We heard oral argument on Attaluri's appeal but, at the request of both the Government and Overholt, no oral

argument was held in his case. Nevertheless, we consolidate these cases because of the overlap of facts and issues. We have jurisdiction under 28 U.S.C. § 1291. We reverse the mail fraud convictions and affirm all other convictions. We also affirm the sentences, except that we remand to the district court to set a payment schedule for restitution by Attaluri.

## I.    Background.

We begin with the factual background. Additional evidence will be described as needed in the discussion of the specific issues on appeal.

### *The Defendants' Businesses and Disposal Wells.*

In 1994 Allied successfully bid to become a subcontractor on four Department of Defense contracts for the removal of underground petroleum storage tanks (USTs) at various military sites throughout the Midwest. The primary contractor would unearth the UST and rinse out any remaining oil sludge or chemical residue. Allied was responsible for hauling the rinsewater to its treatment facility at Bonner Springs, Kansas, where it was to remove any refined petroleum product (which it could sell) and properly dispose of the treated wastewater.

Allied hired independent trucking companies to fulfill its hauling needs. Overholt Trucking was hired from November 1994 to May 1995. Although Allied made representations to the government contractors that it would haul wastewater

from Bonner Springs to publicly owned wastewater treatment facilities, Overholt truckers were often instructed to inject untreated wastewater into disposal wells in Oklahoma. On some occasions Overholt truckers picked up the wastewater from tanks at Bonner Springs. At other times they would arrive at Bonner Springs and simply pick up loads directly from other trucks coming in from the government sites. And at still other times, they would go to the government sites themselves, pick up the rinsewater, and proceed directly to a disposal well, bypassing Bonner Springs altogether. Overholt acted to conceal his company's use of the disposal wells by instructing his drivers to falsify bills of lading to misrepresent the origin and characteristics of the loads and by telling drivers to use the disposal wells at night.

The well owners eventually refused admittance to Overholt's drivers because of Overholt's delinquencies in paying disposal fees and their suspicions that his drivers were dumping illegal wastes. As an alternative, Overholt used the Peko tank battery, a collection of a dozen above-ground oil storage tanks (OSTs) near Drumright, Oklahoma. Despite never receiving permission to use the tanks, Overholt began instructing his drivers to dump truckloads of wastewater there.

In addition to hauling, Overholt had a side-business trading in "burner fuel," a combustible product made from petroleum-based waste. Overholt would treat sludge built up in the bottom of OSTs with a chemical thinning agent, pump

out the resulting "blended oil tank bottom" burner fuel, and sell it for use in industrial furnaces.

### *The Hillside Dump.*

On December 31, 1994, one of Overholt's drivers, Bob Fleming, transported a truckload of wastewater from a military site to Oklahoma for dumping in a disposal well. When he arrived at the well, Fleming was unable to empty the truck's contents because the cold weather had frozen its exit valve. Fleming drove the truck to Overholt's property and left it there, explaining the situation to Overholt. Overholt attempted to fix the valve by beating on it with a hammer. The frozen valve broke, and the truck's contents started spilling down the adjacent hillside. Overholt waited for the spill to abate and replaced the valve. He finished his work around 4:00 a.m. and went to bed.

Early the next morning a neighbor of Overholt's awoke to find that the adjacent creek contained a black, smelly substance that gave off a "real forceful, pungent odor," and stung his eyes and nose. The neighbor called the local deputy sheriff and the Army Corps of Engineers to investigate. The spill was traced to the hill abutting Overholt's property, where a wide trail of dead vegetation led up the hill to Overholt's tanker truck, still parked in his yard.

When Overholt arose that morning, he found the investigators on his property. While repeatedly disclaiming responsibility for the spill, he offered to

clean it up and proceeded to vacuum the waste out of the creek. As soon as the investigators left, the neighbor observed Overholt dumping the pollutants back into the creek. Four to five days after the spill, the neighbor drove to Lake Keystone at the end of the creek and observed oil collecting on the shore. No further investigation into this incident was conducted.

***The Carburetor-Cleaner Incident and Subsequent Investigation.***

In the conduct of his burner fuel business, Overholt sometimes used as a thinner a carburetor cleaner containing ortho-dichlorobenzene, a chlorinated solvent listed as a hazardous material under EPA regulations. *See* 40 C.F.R. § 261.33(f), Hazardous Waste No. U070 (1,2 dichlorobenzene). On May 9, 1995, an Overholt driver hauled a large quantity of the carburetor cleaner to Bonner Springs and put it into one of the tanks to help extract the sludge. With some carburetor cleaner still in his truck, the driver then loaded the contents from another Bonner Springs tank and took it to Peko.

Later that day an Oklahoma Corporation Commission field inspector was driving past Peko when he noticed a tanker truck parked next to one of the tanks. Because he thought Peko had been abandoned, he decided to investigate. He saw a man next to the cab of the tanker truck, covered in open sores, working diligently to shovel dirt over a 10-foot puddle of a clear liquid that smelled like carburetor cleaner. The man said the liquid was oil. The inspector told the man that it was

not oil and asked who owned it. The man said that he did not know. Frustrated with the man's stonewalling, the inspector copied down the tanker's license plate number and continued on his rounds.

After the license check revealed that the truck was Overholt's, the Oklahoma Department of Environmental Quality (ODEQ) launched an investigation. On May 12, ODEQ investigators first stopped at Peko, where vapor readings from the tanks' hatches indicated the presence of organic solvents. The investigation team then proceeded to Overholt's residence, where they noticed that one of the two tanker trucks parked there bore the license tag reported three days earlier. Overholt told the investigators he was hauling gas, oil, and diesel fuel for Allied, and that he was going to use these materials to make burner fuel. He stated that the tanker with the reported license tag contained burner fuel. Although at first he said the other tanker was empty, he then said it contained diesel fuel. As an investigator was taking samples, however, Overholt volunteered that he didn't know what would be in the oil because "you know how the government is."

On May 15 an ODEQ investigator contacted Attaluri to inquire about Allied's business relationship with Overholt Trucking. She asked him to provide documentation relating to that relationship. Two days later another ODEQ investigator followed up on the document request. Attaluri agreed to fax the requested documents that day, but no fax was sent. That same day Attaluri

telephoned Overholt's residence and Overholt then telephoned one of his drivers to ask him to prepare a number of false, back-dated bills of lading indicating that he had hauled burner fuel from Bonner Springs to Peko every Wednesday between March 1, 1995, and April 26, 1995. The driver complied. The Attaluri residence received a call from Overholt's residence that evening. The next day Overholt mailed the falsified bills of lading to Attaluri.

On May 19 an ODEQ investigative team performed tests that revealed ortho-dichlorobenzene contamination at Peko and at Overholt's residence. The ODEQ executed a search warrant for Overholt's residence on June 22. Additional soil samples confirmed the presence of ortho-dichlorobenzene. Six days later, investigators from the ODEQ and the Department of Defense interviewed Overholt at his home. Overholt told them that he had deposited 20 to 30 drums of carburetor cleaner into the two small OSTs on his property and that his drivers had taken some to Peko to clean out the tank bottoms there. The investigators told Overholt that the tanks contained ortho-dichlorobenzene, a hazardous material, and that he should not blend or otherwise dispose of anything in his tanker trucks or in the tanks on his property. When asked about the dead vegetation on his property and the appearance of a spill or a chemical dump, Overholt denied having knowledge of any chemical spills or dumps on his property.

Immediately thereafter, Overholt called Industrial Oil Service, a waste-oil hauling company not licensed to carry hazardous materials, and made arrangements to empty the OSTs on his property. When the driver arrived two days later, he told Overholt that he suspected the fluid in the OSTs was a solvent. Overholt insisted that it was diesel fuel. Before leaving, the driver required Overholt to sign a shipping manifest certifying that the tanker truck did not contain any hazardous wastes.

An ODEQ investigator further questioned Overholt on July 25. Overholt admitted to previously letting rinsewater from his trucks run down the hillside but stated that he would release only five to ten gallons a week, and claimed that he had not done so in over a year. Shortly thereafter, he admitted he would occasionally release hundreds of gallons of rinsewater at a time. The investigator then asked Overholt about the status of the ortho-dichlorobenzene that he had been told not to move. After initially responding that it was still there, he stated that it might not be. He explained that he had hired an oil recycler to pick up some oil from a red tank on his property, but because he was not present when the driver arrived, the company might have taken waste from the tanker truck containing the ortho-dichlorobenzene.

On November 15, 1995, an EPA investigative team obtained a warrant to search Allied's office. They found a file folder containing a copy of the

applicable federal regulations for disposal wells. They also found near Attaluri's desk an envelope containing the false bills of lading prepared by Overholt's driver. The envelope was postmarked from Oklahoma on May 18, 1995, addressed to Allied, with Overholt and his wife listed on the return sticker. Attaluri told the investigators that Overholt was transporting usable oil, which he was free to process into burner fuel for himself. He said that the waste from this process was to be "deep-welled," and that there were no hazardous wastes in anything Overholt was hauling.

## II.  Challenges to the Convictions.

### A.  *The Conspiracy Count*.

Attaluri and Overholt were both convicted of a conspiracy having five objects. The jury returned a general verdict of guilty of the conspiracy, and in five special verdicts stated that the Defendants conspired to achieve each of the alleged objects. Most of Defendants' challenges to the conspiracy conviction relate to fewer than all the objects of the conspiracy—usually only one. As a result, we need not address every challenge. The conviction can be upheld if we find no error regarding the conviction as to any one of the conspiratorial objects. *See United States v. McNutt*, 908 F.2d 561, 565 (10th Cir. 1990) (upholding defendant's two-object conspiracy conviction when one of the charged objects was

not a substantive violation of federal law, but the jury indicated by special verdict that it convicted on both objects).

At the same time, however, we note that the sentencing determinations challenged by Attaluri relate to more than one object of the conspiracy. The challenged restitution award is predicated on conduct related to defrauding the government. One of the challenges to the enhancement of his sentence also relates to the commission of fraud against the government, but a second challenge relates to the improper injection of wastes into disposal wells. We therefore will address his challenges with respect to those two alleged objects of the conspiracy, but we need not address other challenges to the verdict on the conspiracy count.

1.     Violation of SDWA.

      a.     *Class II Disposal Wells*.

Attaluri's first challenge concerns the allegation that he conspired to inject a nonpermitted liquid waste into a Class II disposal well. He argues that the injection was lawful under the governing regulations issued by the Oklahoma Corporation Commission. We reject the argument because the Oklahoma regulations are no more permissive than the federal law on which the jury was instructed.

Before addressing Attaluri's contentions, we review the pertinent provisions of the SDWA. The SDWA established a federally mandated, state-administered

regulatory scheme for the protection of natural sources of drinking water. *See HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1232 (10th Cir. 2000). The Act delegates primary enforcement responsibility to the states. Each state was required to submit for approval by the EPA an "underground injection control program" designed "to assure that underground injection will not endanger drinking water sources." 42 U.S.C. § 300h-1(a)-(b). If the EPA did not approve a program, it was to fashion regulations applicable to the state. 42 U.S.C. § 300h-1(c).

All state programs must meet the EPA minimum requirements published in the Code of Federal Regulations. 42 U.S.C. § 300h(a), (b). The EPA regulations divide underground injection wells into five classes, each defined by what may be injected into wells of that class. 40 C.F.R. § 144.6. The regulations establish minimum construction and maintenance standards for each class. 40 C.F.R. pt. 146. This case involves "Class II" wells, which are "[w]ells which inject fluids:

> (1) Which are brought to the surface in connection with natural gas storage operations, or conventional oil or natural gas production and may be commingled with waste waters from gas plants which are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection.
>
> (2) For enhanced recovery of oil or natural gas; and
>
> (3) For storage of hydrocarbons which are liquid at standard temperature and pressure."

40 C.F.R. § 144.6(b).

Oklahoma's application for primary enforcement power over Class II wells was approved on December 2, 1981. *See* 40 C.F.R. § 147.1851. Oklahoma's program delegates regulatory authority over Class II wells to the Oklahoma Corporation Commission (OCC). *Id.* The OCC regulations divide wells into four categories: (1) enhanced recovery injection wells, (2) disposal wells, (3) storage wells, and (4) simultaneous injection wells. Okla. Admin. Code [OAC] 165:10-5-1. Each category is a type of Class II well. Only the second category, "disposal wells," is at issue in this case. "A disposal well is a well which injects, for purposes other than enhanced recovery, those fluids brought to the surface in connection with oil or natural gas production." OAC 165:10-5-1(2).

The SDWA provides criminal penalties for willful violation "of an applicable underground injection control program." 42 U.S.C. § 300h-2(b). The Act defines "applicable underground injection control program" as "the program (or most recent amendment thereof) (1) which has been adopted by the State and which has been approved [by the EPA] under subsection (b) of this section . . . ." 42 U.S.C. § 300h-1(d).

Attaluri correctly contends that the Oklahoma regulatory scheme is the "applicable underground injection control program" in this case. He further contends, however, that the Oklahoma program allows the allegedly unlawful injections by Defendants. In particular, he contends that the injection wells

Overholt used were "commercial disposal wells," which, in his view, could properly accept the injected chemicals.

Attaluri's brief-in-chief asserts (incorrectly, as we shall point out) that the following definition appears in the Oklahoma regulations at OAC 165:10-1-2:

> "Commercial disposal well" is one that: (a) is operated primarily for profit from the disposal of saltwater and/or other deleterious substances for a fee; and (b) disposes of saltwater and other deleterious substances transported by truck to the facilities used in conjunction with said disposal well or is a disposal well for which none of its owners is an owner in any of the oil and gas wells which produce the saltwater and/or other deleterious substances which will be disposed into said disposal well.

Because the chemicals that a commercial disposal well may accept include "deleterious substances," Attaluri infers that such a well can accept all deleterious substances. "[D]eleterious substances" are defined as "[a]ny chemical, salt water, oil field brine, waste oil, waste emulsified oil, basic sediment, mud, or injurious substance produced or used in the drilling, development, production, transportation, refining, and processing of oil, gas and/or brine mining." OAC 165:10-1-2. Attaluri notes that Allied was in the business of recycling used oil, and that the Oklahoma regulations define "recycling" as "the reuse, processing, reclaiming, treating, neutralizing, or refining of materials and by-products into a product of beneficial use which, if discarded, would be *deleterious substances*." OAC 165:10-1-2 (emphasis added). He concludes that because Allied was an oil

-16-

recycler, the byproducts of the business were deleterious substances, which, by definition, could be injected into a commercial disposal well.

Based on this argument, Attaluri challenges the following jury instruction given at trial:

> With reference to the conspiracy charged in Count 1, you are instructed that the government claims in Count 1 at page 7 that the defendants . . . conspired to violate or cause to be violated Title 42, United States Code, section 300h-2(b)(2), which provides that:
>> Any person who violates any requirement of an applicable underground injection control program . . . if such violation is willful, such person . . .
> shall be guilty of an offense against the laws of the United States. The applicable underground injection control program the government claims were violated are:
> Title 40, Code of Federal Regulations, Part 144.11, which provides:
>> Any underground injection, except into a well authorized by rule or except as authorized by permit . . . is prohibited.
> And, Title 40, Code of Federal Regulations, Part 144.6(b)(1), which provides that Class II injection wells are classified as follows:
>> Wells which inject fluids . . . Which are brought to the surface in connection with natural gas storage operations, or conventional oil or natural gas production and may be commingled with waste waters from gas plants which are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection.

He argues that the instruction improperly refers to federal regulations rather than to Oklahoma law, which he contends was less restrictive, and that the district court should have given the following tendered instruction:

> The government has alleged that the defendants conspired to commit the crime of Wilful Injection of Liquid Waste Into a Class II Disposal Well

-17-

without authority.  The government must prove as to each defendant that he intended to break this law by agreeing to commit the following four (4) essential elements beyond a reasonable doubt:

(1)     Injected or caused to be injected
(2)     A non-permitted liquid waste
(3)     Into a Class II disposal well in Oklahoma
(4)     <u>Without authority from the Oklahoma Corporation Commission</u>
         The defendant must have wilfully agreed to commit each of the elements of the offense.  [emphasis added]

Before addressing Attaluri's arguments, we note the standard of review. The argument on appeal was not raised below.  Attaluri points to nothing in the record, nor have we found anything, indicating an objection by any defendant to the instruction given by the court.  As for the proposed instruction, it does not suggest that the Oklahoma regulations are more permissive than the federal regulations.  Nor have we been directed to, or found, any indication in the record that anyone so argued in district court.  Therefore, we review for plain error.  *See United States v. Fabiano*, 169 F.3d 1299, 1302-03 (10th Cir. 1999) (failure to object to a given instruction, even when the defendant offers his own instruction, does not put the district court "clearly on notice as to the asserted inadequacy," and thus plain-error review is appropriate).  Following *Johnson v. United States*, 520 U.S. 461, 466-67 (1997), we have held:

Under [the plain-error] standard, [the appellant] must show:  (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights.  If these three requirements are met, then we may exercise discretion to correct the error if it

-18-

seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id.* at 1303 (internal quotation marks, citation, and brackets in original omitted).

The district court's instruction defined the "applicable underground injection control program" as the prohibitions mandated in the EPA regulations, and it specifically incorporated the definition of a Class II well as expressing what could legally be injected into the wells at issue in this case. The given instruction informed the jury that Defendants violated the law if they injected into these wells anything but "fluids . . . [w]hich are brought to the surface in connection with natural gas storage operations, or conventional oil or natural gas production and may be commingled with wastewaters from gas plants which are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection." Although it may have been preferable for the instruction to refer to the Oklahoma regulations, the instruction did not mislead the jury because, as we now explain, the substantive standard set forth in the instruction conforms to the Oklahoma regulations.

As previously stated, the Oklahoma regulation defines a "disposal well" as "a well which injects, for purposes other than enhanced recovery, those fluids brought to the surface in connection with oil or natural gas production." OAC 165:10-5-1(2). Comparing this definition to the definition of a Class II well in the jury instruction, it is clear that nothing can be injected into a disposal well that

-19-

cannot be injected into a Class II well. In fact, Class II is a broader category of wells than disposal wells.

We are not persuaded by Attaluri's claim that a different result must follow because the wells here are "<u>commercial</u> disposal wells." Attaluri fails to recognize that commercial disposal wells are a subclass of disposal wells. The actual definition of "commercial disposal wells" in the Oklahoma regulations (not the misquote in Attaluri's brief-in-chief) is:

> "Commercial disposal well" means <u>a disposal well</u> which: (A) Is operated primarily for profit from the disposal of salt water and/or other deleterious substances for a fee; and (B) Disposes of salt water and/or other deleterious substances transported by truck to the facilities used in conjunction with said disposal well or is a disposal well for which none of its owners is an owner in any of the oil and gas wells which produce the salt water and/or other deleterious substances which will be disposed into said disposal well.

OAC 165:10-1-2 (emphasis added). (Attaluri's misquote replaced "a disposal well" by "one," an alteration that could lead to the misconstruction that a commercial disposal well is not necessarily a disposal well.)

The reference to "deleterious substances" in the definition of "commercial disposal well" does not imply that such a well can accept all deleterious substances. Because the well is a disposal well, it can accept only those deleterious substances that can be accepted by disposal wells. A disposal well can accept "fluids brought to the surface in connection with oil or natural gas production . . . ." OAC 165:10-5-1(2). These fluids may well contain deleterious

-20-

substances, as recognized by subpart (B) of the definition of "commercial disposal well," which speaks of "a disposal well for which none of its owners is an owner in any of the *oil and gas wells which produce the salt water and/or other deleterious substances* which will be disposed into said disposal well." OAC 165:10-1-2 (emphasis added). But only deleterious substances from oil or gas production are permitted to be injected.

Our construction of the Oklahoma regulations is based on the natural reading of the language. Moreover, we would be loath to adopt an interpretation of the Oklahoma regulations that, as with Attaluri's interpretation, would make them more permissive than the minimum requirements set by the EPA, which all state programs are obliged to satisfy. Thus, we find no plain error in the jury instruction setting forth what substances could be injected into the wells at issue.

Finally, we note that Attaluri devotes several pages of his brief-in-chief to a discussion of *United States v. Lewis*, No. CR-99-50-B, a case from the United States District Court for the Eastern District of Oklahoma. The defendant in *Lewis* was also prosecuted on a charge of improperly disposing of fluids down a commercial disposal well. The district court in that case dismissed the charge, apparently adopting the view Attaluri urges here regarding what substances are permitted to be injected into such wells in Oklahoma. Because this court is not bound by that decision, *see Abeyta ex rel. Martinez v. Chama Valley Indep. Sch.*

-21-

*Dist., No. 19*, 77 F.3d 1253, 1257 (10th Cir. 1996), we have not reviewed the transcript of that trial (attached as part of the appendix to Attaluri's brief-in-chief) to determine whether the facts distinguish that case from this one. *See also Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1549 n.1 (10th Cir. 1992) (court of appeals will not review documents not before the district court). To the extent that the reasoning of that court is persuasive, Attaluri was, of course, free to present that reasoning on this appeal. Otherwise, that decision has no bearing here.

      b.     *Jury Instruction on Willfulness*.

In defining the alleged conspiratorial object of violating the SDWA, the district court's instruction to the jury stated:

> Any person who violates any requirement of an applicable underground injection control program . . . *if such violation is willful*, such person . . . shall be guilty of an offense against the laws of the United States.

(emphasis added). Attaluri claims that the district court improperly instructed the jury on the meaning of "willful."

The jury instruction given at trial states that an act was committed "willfully" if it "was committed voluntarily and purposefully, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law." Attaluri submitted an instruction that reads: "To commit a crime willfully requires knowledge of the reporting or permit requirement and a

-22-

specific intent to commit the crime, i.e., a purpose to disobey the law." In other words, Attaluri would require that the government prove not only that he acted "with bad purpose either to disobey the law or disregard the law," but also that he knew the specific provision of the law he violated.

The Supreme Court's jurisprudence concerning the state of mind required for a criminal offense does not provide the clearest of guidance in construing criminal statutes. *See generally* Note, *Mens Rea in Federal Criminal Law*, 111 Harv. L. Rev. 2402 (1998). In particular, the word "willfully" has been interpreted to have different meanings in different statutes. *See Spies v. United States*, 317 U.S. 492, 497 (1943) ("willful . . . is a word of many meanings").

Attaluri would have us apply the definition of the term adopted in *Ratzlaf v. United States*, 510 U.S. 135 (1994). In that case, Ratzlaf needed to pay a $160,000 gambling debt to a Nevada casino. *Id.* at 137. He planned to make a $100,000 cash payment, but a casino official informed him that federal and state law would require the casino to report any cash payment exceeding $10,000. *Id.* The official and others suggested that Ratzlaf could pay the debt without triggering the reporting requirements if he used his cash to obtain cashiers checks of $10,000 or less from a variety of banks. *Id.* Ratzlaf did so, after the casino supplied a limousine to take him to the banks. *Id.*

Ratzlaf was charged under 31 U.S.C. §§ 5322(a) and 5324(3) for violating the Currency and Foreign Transactions Reporting Act by willfully structuring a transaction to evade the Act's reporting requirements. *Id.* The Supreme Court held that the statutory requirement of willfulness required proof that the defendant knew that his conduct was unlawful. *Id.* at 145-49. It was not enough to know the reporting requirement and intend to circumvent it by structuring the transaction into sub-$10,000 transactions; the defendant must also have known that the law prohibited such structuring. *Id.*

Attaluri states: "The opinion in <u>Ratzlaf</u> expressed concern that persons engaged in 'small businesses' conducting activities 'not inevitably nefarious' could unintentionally become criminally liable for violating 'the complex of provisions' in which currency structuring laws 'are embedded.' This rationale applies to this case." Reply Br. at 13-14 (citation and miscitation omitted). He proceeds to argue that environmental regulations are now more complex than the tax laws and that the government's interpretation of willfulness would impose an improper risk on all people—from truckers to warehousemen to clerks—who "have anything to do with environmental related activities." *Id.* at 15.

We reject Attaluri's argument. He reads too much into *Ratzlaf* and fails to distinguish contrary authority. First, *Ratzlaf* must be understood in light of the specific statutory language involved. Two statutory provisions had to be construed

-24-

together.  Section 5324, which at the time contained no criminal penalty, made it unlawful to structure a transaction "for the purpose of evading a financial institution's reporting requirement."  *Ratzlaf*, 510 U.S. at 136.  Section 5322 made it a crime to "willfully violat[e]" § 5324 and several other statutory provisions. The Supreme Court stated that the willfulness requirement of § 5322 would be rendered mere surplusage if the only required intent were an intent to evade the reporting requirements, because that intent was already required in § 5324.  *Id*. at 140-41.  The Court pointed out that the willfulness requirement of § 5322 had been given content by lower courts with respect to violations of other sections referenced in § 5322, *id*. at 141-42, and noted the general rule that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears."  *Id*. at 143.

It was in this context that the Court said that it "view[ed] §§ 5322(a) and 5324(3) mindful of the complex of provisions in which they are embedded."  *Id*. at 141.  The Court's reference to the "complex of provisions" was not, as presented in Attaluri's brief, a suggestion that it was imposing the strict mens rea requirement because the law governing reporting financial transactions was complex.

To be sure, later in the opinion the *Ratzlaf* Court supported its interpretation of "willfully" by noting that "currency structuring is not inevitably nefarious."  *Id*.

-25-

at 144.  But that discussion does not assist Attaluri, because his jury (unlike

Ratzlaf's, *see United States v. Ratzlaf*, 976 F.2d 1280, 1282 (9th Cir. 1992)) was

instructed that he was required to act "with bad purpose either to disobey the law

or disregard the law"—which makes the conduct nefarious.

Rather than following *Ratzlaf*, we look to the Supreme Court's most recent

opinion addressing the meaning of willful.  In *Bryan v. United States*, 524 U.S.

184 (1998), the defendant was convicted of willfully dealing in firearms without a

federal license and conspiring to do so. *Id.* at 189.  The jury was instructed:

> A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law.  Now, the person need not be aware of the specific law or rule that his conduct may be violating.  But he must act with the intent to do something that the law forbids.

*Id.* at 190.  The Supreme Court endorsed the instruction.  It acknowledged *Ratzlaf*,

as well as several tax-evasion cases, such as *Cheek v. United States*, 498 U.S. 192

(1991), which required the jury to "find that the defendant was aware of the

specific provision of the tax code that he was charged with violating."  524 U.S. at

194.  But it distinguished those cases because they "involved highly technical

statutes that presented the danger of ensnaring individuals engaged in apparently

innocent conduct."  *Id.*  "As a result," the Court continued, "we held that these

statutes 'carv[e] out an exception to the traditional rule' that ignorance of the law

is no excuse and require that the defendant have knowledge of the law."  *Id.* at

194-95 (quoting *Cheek*, 498 U.S. at 200). Then, in a sentence that applies equally to this case, the Court said, "The danger of convicting individuals engaged in apparently innocent activity that motivated our decisions in the tax cases and *Ratzlaf* is not present here because the jury found that this petitioner knew that his conduct was unlawful." *Id*. at 195.

In our view, the charge against Attaluri does not belong within the exception to the rule that ignorance of the law is no excuse. First, as in *Bryan* itself, the willfulness instruction here eliminated "[t]he danger of convicting individuals engaged in apparently innocent activity . . . because the jury found that [Attaluri] knew that his conduct was unlawful." *Id*. at 195.

Moreover, when addressing laws like the SDWA, the Supreme Court has been particularly resistant to requiring proof of knowledge of the law. In *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558 (1971), the charge was that the defendant had shipped sulfuric and hydrofluosilicic acid in interstate commerce but knowingly failed to describe the acids properly on the shipping papers. The Court rejected the argument that the government must prove that the defendant knew the regulation it was accused of violating. The opinion concluded, "[W]here . . . dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is

-27-

aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id*. at 565.

We assume that Attaluri is correct when he asserts that environmental regulations are now the most complex of federal regulations, exceeding even tax regulations. But we strongly doubt that as the federal government has sought to protect the environment by imposing more and more restrictions on those handling dangerous chemicals, Congress has intended to reduce the burden on such persons to inform themselves of what the law requires.

In short, we have no reason to believe that the word "willful" in 42 U.S.C. § 300h-2(b)(2) requires proof of knowledge of the regulation allegedly violated. We have no occasion to consider whether less is required than was set forth by the jury instruction in this case.

c.      *Good Faith Instruction*.

Attaluri requested a "mistake of law" or "good faith" instruction with respect to all objects of the alleged conspiracy. The district court gave a good faith instruction with respect to the allegations of fraud but otherwise refused the request. On appeal Attaluri challenges the failure to instruct on the defense that he in good faith misunderstood the law regarding what liquid waste could be injected into Oklahoma disposal wells.

"A defendant is entitled to a good faith instruction when he has interposed the defense of good faith, has requested the instruction, and when there is sufficient evidence to support it." *United States v. Janusz*, 135 F.3d 1319, 1322 (10th Cir. 1998). We have held that when those conditions are met, a good faith instruction is required, even if an instruction on willfulness has been given. *United States v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984) (en banc). On this issue we are an outlier. *See United States v. Sirang*, 70 F.3d 588, 594 (11th Cir. 1995) (comparing the 1st, 4th, 5th, 8th, and 11th Circuits, which do not require a good faith instruction for specific intent crimes, with the 10th Circuit, which does); *see also Green v. United States*, 474 U.S. 925 (1985) (White, J., dissenting from denial of certiorari and noting the circuit split on the issue). We therefore assume that such an instruction would be required here if the factual predicates were present.

Attaluri relies on the testimony of several witnesses to support his claim. The evidence, however, establishes only the *witnesses'* opinions regarding the law, not Attaluri's. Three of these witnesses described conversations that occurred during the investigation of Overholt's hillside dump, yet nothing in the record suggests Attaluri ever knew about any of the conversations. Another witness was a former owner of a Class II well who testified that he generally understood that such wells could accept refined petroleum products, but, contrary to an assertion in

Attaluri's brief, there was no evidence that he communicated his belief to Attaluri. A fifth witness was an Allied employee who stated that she signed bills of lading directing refined petroleum products to be delivered to disposal wells because she thought there was nothing wrong with such disposal. Finally, when Attaluri cites to testimony by an OCC employee who opined that it was difficult to know what could legally be put into a disposal well, he fails to note that the testimony was in a different trial. Absent from Attaluri's discussion is any evidence that he personally believed that the unlawful injection of chemical wastes into the Oklahoma disposal wells was actually lawful. Thus, he failed to satisfy the final element of the *Janusz* test and the district court was not required to give a mistake-of-law/good-faith-defense instruction. *See Janusz*, 135 F.3d at 1322-23.

2.    Defrauding the United States.

One of the alleged objects of the conspiracy was "to defraud the United States by impeding, impairing, obstructing, and defeating the lawful function of the United States Environmental Protection Agency and the United States Department of Defense." Attaluri complains that the jury instruction and verdict form could lead the jury to believe that conduct, "even though done honestly or without deceitful purpose, that nevertheless impeded or created difficulties for a government agency, qualified as a federal crime." Br. at 37.

The argument is unfounded. The pertinent jury instruction was as follows:

With further reference to the conspiracy charged in Count 1, you are instructed that the government claims the defendants . . . also conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the Environmental Protection Agency and the United States Department of Defense to limit environmental contamination, to enforce environmental protection standards and to dispose of military wastes properly. In regard to this allegation, you are instructed that the government must prove beyond a reasonable doubt that the conspiracy had as a purpose to obstruct a lawful function of the government <u>by deceitful or dishonest means</u> and at least one act in furtherance of such purpose was accomplished. [emphasis added]

The instruction clearly conveys the requirement of deceit or dishonesty.

As for the verdict form, it stated simply:

**<u>VERDICT FORM # 1</u>**

as to KOTESWARA ATTALURI

* * *

**Count 1**               NOT GUILTY        _____

                          GUILTY            _____

If you have found the defendant, KOTESWARA ATTALURI, guilty of Count 1, please indicate whether you unanimously find the defendant conspired to commit:

* * *

➣      Defrauding the United States by Impeding, Impairing, Obstructing, and Defeating the Lawful Functions of the Environmental Protection Agency or the United States Department of Defense.


        Yes      _____            No      _____

The purpose of the verdict form is not to repeat the elements of the offense. The

language on the form serves only to identify where the jury should indicate its

-31-

verdict on each count or, in the case of the special verdicts, on each alleged object of the conspiracy. The form nowhere indicates the elements of a conspiracy charge, or even names the offenses in the other counts. The jury could not possibly have been misled into believing that it could ignore the elements instruction. As we have stated before: "The instructions submitted to the jury contained the language he argues should have been in the verdict form. The fact that the question on the verdict form does not contain the language the instructions contain is immaterial." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1301 (10th Cir. 1998).

3.     Sufficiency of the Evidence.

a.     *Attaluri Challenge*.

Attaluri challenges the sufficiency of the evidence of fraud against the government if Overholt's injection of wastes into Class II wells was lawful. Because we affirm that the injection was unlawful and Attaluri concedes that such a ruling would moot this challenge, we need not address it further.

b.     *Overholt Challenge*.

Overholt argues that his conspiracy conviction must be overturned because there was insufficient evidence to prove he knew of the conspiracy's alleged common goal or objective. Stating that "[t]he conspiracy's goal was to receive payment from the federal government for services that Allied did not render

properly," Br. at 20, he asserts that he was unaware of Allied's specific contractual obligations to the government and hence could not have had the goal of defrauding the United States by illegally disposing of the waste. His only interest, he asserts, was to make a profit by transporting the waste wherever Allied instructed. This argument, however, relates to only the "fraud" objects of the alleged conspiracy. He does not challenge the sufficiency of the evidence with respect to the objects of violating the SDWA or RCRA. Therefore, we need not consider the argument's merits. *See McNutt*, 908 F.2d at 565.

B. *Mail Fraud (Overholt and Attaluri).*

To convict of mail fraud, it is necessary to prove a use of the mails. The government relied on Overholt's mailing of fraudulent bills of lading to Attaluri on May 18, 1995. Defendants contend that this mailing did not satisfy the requirements of the mail fraud statute. Overholt challenges his mail fraud conviction on the ground that there was insufficient evidence to establish that the bills of lading were false or that they were used or intended to be used to defraud anyone. Attaluri claims that he was an innocent recipient of Overholt's false bills of lading.

We review the sufficiency of the evidence *de novo*. *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999). The test is "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences

to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*. (internal quotation marks omitted).

On May 15, 1995, an ODEQ investigator contacted Attaluri to inquire about Allied's business relationship with Overholt Trucking. She asked Attaluri to provide her with documentation regarding the relationship. Two days later, ODEQ investigator Michael Freeman telephoned Attaluri and asked for "shipping papers of any materials that he had shipped to Mr. Overholt." Although Attaluri agreed to fax the requested documents to Freeman later in the day, the fax never came. At 3:18 p.m. on the same day, Attaluri telephoned Overholt's residence. The content of that conversation is unknown. At 5:55 p.m. Overholt telephoned one of his drivers, Bob Fleming. Fleming testified that Overholt "wanted to know if I'd make him up some bills [of lading] for each Wednesday from one certain date to another and put on it burner fuel, because he said the OCC was coming to check his paperwork." Fleming did so, but testified that "these are fake bill[s] of lading[]," and that he never made the hauls referred to in the documents. At 7:27 that evening Overholt placed a telephone call to the Attaluri residence. The next day, May 18, Overholt mailed the falsified bills of lading to Attaluri at Allied. When EPA investigators searched Allied's offices on November 15, 1995, they

found the bills of lading on Attaluri's desk, in a postmarked envelope with Overholt as the return addressee.

Fleming's testimony is sufficient for the jury to find beyond a reasonable doubt that the bills of lading were false and that Overholt had the requisite intent to defraud. Likewise, the timing of the mailing in relation to Freeman's telephone call to Attaluri, particularly in light of the telephone calls made within a few hours of Freeman's call, could properly establish that Attaluri was a knowing participant in this part of the scheme to defraud.

Nevertheless, we must reverse the convictions for mail fraud. There is no evidence that Defendants ever used the fraudulent bills of lading. Perhaps this is merely fortuitous. Attaluri may have intended to provide them to Freeman or any other ODEQ investigator who followed up on Freeman's call, but no one followed up. Regardless, the jury was instructed that "[t]he government must prove beyond a reasonable doubt, however, that the use of the mails furthered, or advanced, or carried out, in some way, the scheme or plan to defraud." Although we are not certain whether the instruction accurately states the law—the mail fraud statute says that the mailing must be "*for the purpose* of executing such scheme or artifice or attempting so to do," 18 U.S.C. § 1341 (emphasis added), which suggests that it suffices to have the purpose of advancing the scheme when the mailing occurs, *but see United States v. McClain*, 934 F.2d 822, 835 (7th Cir. 1991) (mail fraud

conviction overturned because defendants never used the phony credentials obtained through the mail)—the government has not challenged the instruction at trial or on appeal, so we adopt it as the law of the case. *See United States v. Romero*, 136 F.3d 1268, 1271-73 (10th Cir. 1998).

Despite our setting aside the convictions for mail fraud, the sentences are not thereby affected. Elimination of the mail fraud conviction would not change the ultimate offense level under the Sentencing Guidelines for either Defendant. Also, because our setting aside the mail fraud conviction would not compel the sentencing court to change in any way its assessment of the substance of Defendants' misconduct, we do not think it is a realistic possibility that eliminating the mail fraud conviction would alter the sentencing court's exercise of discretion in fixing the sentence within the guideline range.

C.     ***Discharging Pollutant into Waters of the United States (Overholt).***

Overholt contends that there was insufficient evidence to convict him of the alleged Clean Water Act violation because the Government did not prove that the oily substance he dumped down the hillside entered the "waters of the United States." He does not challenge the definition of "Waters of the United States" in 40 C.F.R. § 122.2, which includes:

> (c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams) . . . or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign

commerce including any such waters: (1) Which are or could be used by interstate or foreign travelers for recreational or other purposes; [and] . . .

(e) Tributaries of waters identified in paragraphs (a) through (d) of this definition . . . .

Nor does he deny that Keystone Lake, an intrastate body of water, is a "water[] of the United States." Overholt's argument appears to be simply that there was no evidence that the spill entered the lake.

The argument fails on two grounds. First, it was unnecessary for the government to prove that the spill entered the lake. Under the regulation, the creek, too, constituted "Waters of the United States," because it was a tributary of the lake. *See Quivira Mining Co. v. E.P.A.*, 765 F.2d 126, 129-30 (10th Cir. 1985) (noting cases holding that nonnavigable streams are "Waters of the United States" if they are tributaries of navigable waters). Overholt admits that several witnesses testified that the spill entered the creek. Second, there was sufficient evidence for the jury to find that the spill entered Keystone Lake itself. An Overholt neighbor testified that he drove to the end of the creek four or five days after the spill and saw oil collecting on the shores of Keystone Lake. Hence Overholt's conviction on this count must stand.

D.     ***Transporting Hazardous Waste to Facility Without a Permit (Overholt).***

The indictment charged Overholt with knowingly causing the transportation of hazardous materials (carburetor cleaner) to a facility that was not permitted to accept them. He argues that there was insufficient evidence to convict him on this count because the Government failed to prove he knew that the facility where he sent the carburetor cleaner lacked a hazardous waste permit.

The RCRA provides criminal penalties for "any person who . . . knowingly transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter . . . ." 42 U.S.C. § 6928(d)(1). Although this circuit has not spoken directly on the issue, those courts that have considered the "knowingly" requirement under this statute agree that the Government must show that the defendant knew the facility did not have a hazardous waste permit. *See United States v. Speach*, 968 F.2d 795, 796 (9th Cir. 1992); *United States v. Hayes Int'l Corp.*, 786 F.2d 1499, 1504 (11th Cir. 1986). Because the government does not argue otherwise on this appeal, we assume without deciding that the government had to prove that Overholt knew the hazardous waste was being transported to a facility without a permit.

ODEQ inspectors told Overholt that his storage tanks contained ortho-dichlorobenzene (a component of the carburetor cleaner) and instructed him not to remove it. Despite the inspectors' warnings, Overholt promptly arranged to

dispose of the hazardous material. He called a trucking company, falsely telling it that he needed 3,000 gallons of diesel fuel hauled away. The trucking company did not have a permit to haul or store hazardous materials. Two days later, when the driver sent to do the job asked Overholt whether the tanks contained some kind of solvent, Overholt insisted that the substance was diesel fuel. Overholt signed a manifest stating that the load contained no hazardous materials. He did not ask anyone at the trucking company whether it carried a hazardous waste permit for its trucks or disposal facility. When Overholt was questioned a month later by an ODEQ investigator about what had happened to the hazardous material, he told a series of lies.

The jury could properly find beyond a reasonable doubt that Overholt would have had no reason to engage in his consistent pattern of deceit unless he knew the trucking company lacked a proper permit. *See United States v. Self*, 2 F.3d 1071, 1088 (10th Cir. 1993) ("Certainly, the government may prove a defendant had actual knowledge of a material and operative fact by proving deliberate acts committed by the defendant from which actual knowledge can be logically inferred.") (internal quotation marks omitted).

III. **Sentencing Issues**.

    A. *Overholt Challenges*.

1. Absence of Factual Findings.

United States Sentencing Guideline (U.S.S.G.) § 3B1.1(a) provides for an increase in offense level if the defendant was the "organizer or leader of a criminal activity." Overholt objects to the application of this provision by the sentencing court because it failed to make specific findings of fact. He relies on Federal Rule of Criminal Procedure 32(c)(1), which states that at the sentencing hearing, "[f]or *each matter controverted*, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." (Emphasis added).

Overholt cannot invoke this rule, however, because he did not properly "controvert" the assertion that he was an organizer or leader. The probation office delivered Overholt's presentence report (PSR) to him on February 28, 2000. Yet he raised no objections to the PSR until his sentencing hearing on April 11, 2000—42 days later. Under Federal Rule of Criminal Procedure 32(b)(6)(B), objections to the PSR must be submitted within 14 days of receipt; the probation office must then submit the PSR, together with an addendum responding to any unresolved objections, at least seven days before the sentencing hearing. Fed. R. Crim. P. 32(b)(6)(C). Because Overholt's objections were untimely, the sentencing court could properly proceed as if no objection had been made. The court was entitled to rely upon the PSR without making independent factual findings. *See United States v. Hardwell*, 80 F.3d 1471, 1500 (10th Cir. 1996)

(district court not required to hear government's objections to PSR first raised at sentencing hearing); *United States v. Chung*, 261 F.3d 536, 538-39 (5th Cir. 2001) (district court not required to hear defendant's objections to PSR first raised at sentencing hearing).

2.      Criminal History Calculation.

Overholt next challenges the determination of his criminal history category under the Sentencing Guidelines. The sentencing court set the category at level II based on two 1987 misdemeanor convictions in Oklahoma: (1) dispensing nonintoxicating alcoholic beverages without a license and (2) contributing to the delinquency of a minor. Overholt asserts that consideration of these offenses violated the Guidelines.

In calculating a defendant's criminal history category, the sentencing court must consider not only all felonies but also all misdemeanors and petty offenses, except as provided in U.S.S.G. § 4A1.2(c). Section 4A1.2 (c)(1) lists fifteen offenses that "are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." Section 4A1.2 (c)(2) lists six offenses that are never considered: hitchhiking, juvenile status offenses and truancy, loitering, minor traffic infractions, public intoxication, and vagrancy. Any prior

offense that is "similar" to a listed offense in either category is also excluded. U.S.S.G. § 4A1.2(c)(1)-(2).

Because Overholt failed to raise his challenge in district court, we review only for plain error. *United States v. Whitney*, 229 F.3d 1296, 1308 (10th Cir. 2000). Overholt's two offenses—dispensing nonintoxicating alcoholic beverages without a license and contributing to the delinquency of a minor—are not listed in § 4A1.2(c)(1) or (2). Therefore, Overholt's challenge can succeed only if his offense is "similar" to one listed. In assessing similarity, we "examine whether the underlying behavior necessary to commit the prior misdemeanor shares the same general characteristics as the behavior required to commit an offense expressly listed under (c)(1) or (c)(2)." *United States v. Perez de Dios*, 237 F.3d 1192, 1197 (10th Cir. 2001).

Overholt does not specify which of the twenty-one listed offenses is similar to distributing non-intoxicating alcoholic beverages without a license or contributing to the delinquency of a minor. He merely asserts that, like his prior offenses, all the listed offenses are of "relative insignificance." Such a vague argument is hardly helpful.

In any event, we fail to see a listed offense that is plainly similar to either of Overholt's prior offenses. The PSR describes the actions that formed the predicate for both of Overholt's convictions as "caus[ing], aid[ing], abett[ing], and

-42-

encourag[ing] a planned event for high school students between the ages of sixteen and seventeen years old whereby the students were permitted to enter an establishment . . . and pay a $5.00 'cover charge' that permitted them to obtain and drink all the beer they wish[ed] to drink." None of the offenses listed in U.S.S.G. § 4A1.2(c) has anything to do with facilitating underage drinking. The Fourth Circuit has held that the Florida offense of selling alcohol to a minor is not similar to any of the offenses listed in § 4A1.2(c) because it does not share common elements with any of them. *United States v. Harris*, 128 F.3d 850, 855 (4th Cir. 1997) ("none involve selling alcohol; none involve transactions with minors"). Although we have noted that the Fourth Circuit's "elements approach" is more restrictive than our own approach to similarity, *see Perez de Dios*, 237 F.3d at 1198, we believe the same result is required by our own approach. The district court did not plainly err when it included Overholt's prior misdemeanor convictions in his criminal history calculation.

> B. ***Attaluri Challenges.***

1. <u>Restitution</u>.

Attaluri was ordered to pay restitution in the amount of $1,265,078. The probation office calculated this amount as the cost to the Coast Guard of removing the storage tanks from the Peko property and cleaning up the area.

On appeal Attaluri argues that this award is erroneous for several reasons: (1) the award violates the Ex Post Facto Clause; (2) federal law prohibits restitution awards from exceeding the value of the property restored; (3) the Coast Guard costs were unrelated to his conviction, because the Coast Guard was engaged in only "a routine cleanup operation in the area," Br. at 53; (4) the contamination of Peko was caused, at least in part, by persons other than Defendants; (5) Attaluri could not have reasonably foreseen Overholt's use of the Peko tank farm; (6) the cleanup was unnecessary; and (7) the restitution order failed to set a reasonable payment schedule. In district court Attaluri's sole objection to the restitution award was that he did not pollute the Peko property, Overholt did; he does not reassert that argument here. Thus Attaluri has abandoned the only argument he had preserved on this issue. We therefore will review only for plain error. *See United States v. Johnson*, 183 F.3d 1175, 1178-79 (10th Cir. 1999).

Attaluri's arguments that the Peko cleanup was not related to his offense, that the damage came from other sources, that Overholt's use of the tank farm was not foreseeable, and that the Peko cleanup was unnecessary are all purely factual issues unraised in district court. The PSR sets forth sufficient information to support the determination that the cleanup cost was a foreseeable consequence of Attaluri's criminal conduct. Attaluri's failure to raise his factual challenges at

sentencing prevented the probation office from reviewing any of these disputes and prevented the district court from resolving them.  In such circumstances, we consider the issue waived and will not find plain error.  *See United States v. Saucedo*, 950 F.2d 1508, 1518 (10th Cir. 1991) (failure to assert factual challenge at sentencing waives the challenge), overruled on other grounds, *Stinson v. United States*, 508 U.S. 36 (1993); *see also United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998) ("This court has held repeatedly that factual disputes not brought to the attention of the [trial] court do not rise to the level of plain error.").

Because the value of the Peko property is a fact issue, we might also be able to rely on the same ground to dispose of Attaluri's claim that the restitution award could not properly exceed the value of the Peko property.  Regardless, we find no plain error because if there was error, it was not "clear or obvious under current law."  *United States v. Hughes*, 191 F.3d 1317, 1322 (10th Cir. 1999) (internal quotation marks deleted) (stating test for plain error).  Attaluri relies on a provision of the Mandatory Victim Restitution Act (MVRA) stating that when an offense results "in damage to or loss or destruction of property of a victim of the offense" and return of the property to the owner is "impossible, impracticable, or inadequate," the defendant "shall" be ordered to:

pay an amount equal to–
(i) the greater of –

        (I) the value of the property on the date of the damage, loss, or
destruction; or
        (II) the value of the property on the date of sentencing, less
(ii) the value (as of the date the property is returned) of any part of
the property that is returned; . . . .

18 U.S.C. § 3663A(b)(1)(B).  (The identical language appears in the Victim and

Witness Protection Act (VWPA), 18 U.S.C. § 3663, except that it makes restitution

discretionary by saying that the defendant "may," rather than "shall," be ordered to

pay the designated amount.)

Attaluri contends that the property damaged here is the Peko property, so

that restitution is limited to the value of that property.  But the Coast Guard's loss

was not as an owner of the Peko property.  Its loss was a purely financial one; the

property it lost was money.  Purely financial losses have been recognized as proper

subjects of restitution under both 18 U.S.C. § 3663 and § 3663A.  *See*

*United States v. Sapoznik*, 161 F.3d 1117, 1121-22 (7th Cir. 1998) (affirming order

under the MVRA requiring a corrupt city police chief to repay the city one-fourth

of his salary while on the take from the Mafia); *United States v. Sanga*, 967 F.2d

1332, 1335-36 (9th Cir. 1992) (affirming order under the VWPA requiring an alien

smuggler to pay a victim held in virtual slavery the difference between a fair wage

and the pittance he had paid her); *see also United States v. Lowell*, 256 F.3d 463

(7th Cir. 2001) (bankruptcy trustee compensated for time expended as a result of

the defendant's efforts to cover up his crime).

Perhaps the above-quoted language in the restitution statutes could be read to say that when there is physical damage to property, the only permissible restitution is payment to the property owner of the amount calculated in accordance with that language, regardless of any financial loss to another victim who was not an owner of the property. But that perverse reading of the statute is certainly not "clear or obvious under current law." If it were, we question whether the Third Circuit would have upheld an order of restitution under the VWPA requiring the defendants to pay the Coast Guard's cost of cleaning up their pollution of navigable waters. *See United States v. West Indies Transp., Inc.*, 127 F.3d 299, 315 (3d Cir. 1997). Accordingly, we find no plain error with respect to this contention.

Attaluri's remaining arguments are legal challenges. First is Attaluri's claim that the restitution award violates the Ex Post Facto Clause, because his crime predated the enactment of the MVRA. As Attaluri recognizes, however, we have previously rejected the argument that the Ex Post Facto Clause applies to restitution, because the purpose of restitution is not punishment. *United States v. Nichols*, 169 F.3d 1255, 1279-80 (10th Cir. 1999).

Finally, Attaluri argues that the district court erred by failing to set a reasonable schedule for payment of the restitution award, as required by 18 U.S.C. § 3664(f)(2). The PSR provided an analysis of Attaluri's financial status. At the

time of sentencing, the total value of his assets was $73,100. His net worth was negative because he had unsecured debt of $168,100, not including unpaid attorney fees in excess of $175,000. Although Attaluri held a graduate degree in chemistry, he had no monthly income. His wife had gross monthly income of $4,300, but their household expenses led to a monthly cash flow of negative $443. He was planning to file both personal and corporate bankruptcy. On the other hand, Attaluri hoped to obtain employment in the future and his parents had "some wealth," a portion of which he expected to inherit sometime in the future. The PSR concluded: "Any restitution applicable in this case is mandatory. Based on the defendant's financial profile, he does not have the ability to pay a fine."

The district court ordered that the "[r]estitution shall be paid in full immediately. Any amount not paid immediately shall be paid while in custody through the Bureau of Prisons' Inmate Financial Responsibility Program. Upon release from custody, any unpaid balance shall be paid as a condition of supervised release . . . ." The Government argues that remand for a payment schedule is unnecessary because the restitution order provides for an appropriate payment schedule to be set by the Bureau of Prisons while he is incarcerated and by the probation office during his subsequent supervised release.

The district court well knew that Attaluri could not immediately pay the full amount of the restitution award. Thus, it was essentially delegating the

preparation of a payment schedule to the Bureau of Prisons and the probation office.  Our sister circuits are split on whether such delegation is lawful, although a majority forbid it.  *Compare United States v. Porter*, 41 F.3d 68, 71 (2d Cir. 1994) (delegation not permitted); *United States v. Coates*, 178 F.3d 681, 685 (3d Cir. 1999) (same); *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995) (same); *United States v. Albro*, 32 F.3d 173, 174 (5th Cir. 1994) (same); *United States v. Mohammad*, 53 F.3d 1426, 1438-39 (7th Cir. 1995) (same); *United States v. McGlothlin*, 249 F.3d 783, 785 (8th Cir. 2001) (same); *with Weinberger v. United States*, 268 F.3d 346, 360 (6th Cir. 2001) (permitting delegation); *United States v. Signori*, 844 F.2d 635, 641 (9th Cir. 1988) (same); *United States v. Fuentes*, 107 F.3d 1515, 1528 n.25 (11th Cir. 1997) (same, but criticizing binding circuit precedent).  In our view, such delegation is improper and constitutes plain error.

The governing statute is 18 U.S.C. § 3664, entitled "Procedure for issuance and enforcement of order of restitution."  This statute, particularly as amended by the Anti-terrorism and Effective Death Penalty Act (AEDPA) in 1996, clearly contemplates judicial control of restitution payment schedules.  Section 3664(f)(2) requires the district court to set a payment schedule based on the defendant's financial resources.  It states:

> Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the

manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--
(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
(B) projected earnings and other income of the defendant; and
(C) any financial obligations of the defendant; including obligations to dependents.

The court is able to specify such a schedule because of the information provided in accordance with § 3664(d)(3), which states:

> Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

The court is granted considerable discretion in structuring a payment schedule. Section 3664(f)(3) provides:

> (A) A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.
> (B) A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

Of course, the defendant's economic circumstances may change significantly over time. Perhaps the most persuasive reason for delegating the preparation or modification of the payment schedule to the Bureau of Prisons or the probation

office is to allow for adjustments when economic circumstances change. *See Weinberger*, 268 F.3d at 362-64 (Cohn, J., concurring). But § 3664 specifically addresses what is to happen in such a situation. The court is to be notified of the change in circumstances and then may adjust the schedule accordingly. Section 3664(k) states:

> A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

In light of this statutory scheme, we see no room for delegation by the district court with respect to payment schedules for restitution. We therefore reverse the restitution award and remand for the sole purpose of establishing a schedule for Attaluri's payment of the amount of restitution previously awarded. Although it may appear obtuse to hold that it is plain error to delegate the task of setting a payment schedule when there is contrary authority in other circuits, in each of those decisions either the opinion predated the AEDPA amendments to § 3664 or the present provisions of § 3664 were not brought to the attention of the court.

2.    Enhancement of Sentence.

Attaluri's offense level was enhanced under U.S.S.G. § 2Q1.2(b)(1)(A),

which provides:

> If the offense resulted in an ongoing, continuous, or repetitive discharge,
> release, or emission of a hazardous or toxic substance or pesticide into
> the environment, increase by 6 levels . . . ."

The district court applied the provision because of the unlawful injection of liquid

wastes into Class II disposal wells.  Attaluri contends that his sentence

enhancement under this guideline is improper because (1) he did not discharge

anything into the "environment," and (2) the enhancement cannot apply unless the

environment was actually contaminated.  Although Attaluri argued in district court

against the enhancement, he did so on the basis that he did not make a "repetitive"

discharge.  We therefore again review only for plain error.

In support of his first contention, Attaluri cites the CD-ROM dictionary,

Encarta 1999, for the proposition that "environment" means the "natural world in

which people, animals and plants live."  Because the waste was injected 4000 feet

below the surface, where no people or animals or plants live, Attaluri concludes

that he did not dump hazardous waste into the "environment."

There are, however, broader definitions of the word "environment" than

Encarta provides, such as "surroundings," Webster's II New Riverside Dictionary

232 (rev. ed. 1996), and "that which environs; the objects or the region

-52-

surrounding anything," Oxford English Dictionary (2d ed. 1989) (electronic). The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) definition of "environment" includes "any other surface water, ground water, drinking water supply, land surface *or subsurface strata*, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601(8) (emphasis added). Such broader definitions certainly allow the inclusion of the Earth's upper crust as a part of the "environment."

The concern of § 2Q1.2(b)(1)(A) is harm to life from dangerous chemicals. We conclude that the "environment" encompasses at least those portions of the earth's crust whose contamination can impact human health. Although Attaluri contends that the waste injected into the disposal wells was trapped far below any water used for drinking, he misreads the record. The testimony at trial revealed that the principal function of the restrictions imposed by the Safe Drinking Water Act on injections into disposal wells is to prevent contamination of potential sources of drinking water. We therefore hold that injecting chemicals into such a well is a discharge into the "environment" for purposes of § 2Q1.2(b)(1)(A).

With respect to Attaluri's contention that § 2Q1.2(b)(1)(A) applies only when there is actual contamination of the environment, Attaluri claims to find support in *United States v. Ferrin*, 994 F.2d 658 (9th Cir. 1993). In *Ferrin* the defendant deposited hazardous waste into a dumpster. The waste was retrieved

before the dumpster was emptied. *Id*. at 660. The court held that simply putting the waste into the dumpster did not trigger § 2Q1.2(b)(1)(A). *Id*. at 664. It relied on Application Note 5 to the section, which states in part, that "[s]ubsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination." The court concluded that the section applies only when the environment is contaminated. *Id*. at 663. *But see United States v. Liebman*, 40 F.3d 544, 550-51 (2d Cir. 1994) (proof of actual contamination of the environment is not necessary); *United States v. Goldfaden*, 959 F.2d 1324, 1331 (5th Cir. 1992) (same); *United States v. Bogas*, 920 F.2d 363, 367-68 (6th Cir. 1990) (same); *United States v. Cunningham*, 194 F.3d 1186, 1201-02 (11th Cir. 1999) (same).

Yet even if we were to reject the majority view and follow *Ferrin*, Attaluri would not benefit. *Ferrin* stated that environmental contamination occurred whenever "the hazardous waste came into contact with land or water or was released into the air." 994 F.2d at 664. The court remanded to the district court to determine whether any gaseous hazardous waste escaped into the atmosphere. *Id*. In short, the simple release of a toxic or harmful substance into the environment constitutes contamination. By dumping harmful substances into the disposal well, Defendants contaminated the environment. There was no plain error.

3.  Amount of Loss from Fraud.

The district court increased Attaluri's offense level under U.S.S.G. § 2F1.1(b)(1)(H), because the loss to the victim—the United States—resulting from Attaluri's fraud exceeded $120,000. (Amendment 617 to the Sentencing Guidelines, effective November 1, 2001, repealed § 2F1.1 and moved its substance to § 2B1.1) At sentencing Attaluri contended that the loss was not more than $40,000. If his argument had been adopted, Attaluri's offense level would have been 23 instead of 24.

The loss to the United States was the amount paid by the United States to Allied for disposal of waste that was unlawfully injected into disposal wells. The presentence report calculated that loss at $132,325.91 by using the figure of $199,825.91 for the total amount paid to Allied and then giving an offset of $67,500 for an estimated 150,000 gallons of wastewater disposed of lawfully from one of the government sites. Attaluri did not contest the $199,825.91 figure for the total amount paid Allied. But he did challenge the PSR's conclusions regarding the amount of wastewater disposed of properly.

We review the sentencing court's factual findings for clear error. *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999). The application note to § 2F1.1 stated, "For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment (n.9).

On appeal Attaluri directs our attention to a trial exhibit which, he contends, shows that significantly more than 150,000 gallons of wastewater were disposed of properly. Yet he did not reference that exhibit in his objection to the PSR. The sole basis of his objection to the PSR was a document showing how many gallons of wastewater were delivered by Allied to Waste Water Treatment, Inc., during the second half of 1995. The document failed, however, to indicate the source of the wastewater—whether a government facility or otherwise. The PSR response to Attaluri's objection was: "The defendant stated that the government's loss calculation was closer to $120,000 but did not detail how that number was calculated. The probation office is unaware of any other adjustments that would apply . . . ." The sentencing court could properly agree. We refuse to reverse that determination on the basis of a trial exhibit not brought to the attention of the court at sentencing, so we need not determine whether the exhibit might have influenced the court if it had been properly presented.

## IV.  Conclusion.

We therefore REVERSE the convictions for mail fraud, otherwise AFFIRM the jury verdicts, and AFFIRM the sentences of both Defendants except that we REMAND to the district court to set a repayment schedule for the previously determined amount of restitution to be paid by Attaluri.[1]

---

[1]We also grant Attaluri's Motion to File a Supplemental Appendix.