**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WILLIAM F. BLIND, JR.,

Defendant - Appellant.

No. 10-6159

(W.D. Oklahoma)

(D.C. No. 5:08-CR-00294-C-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **BRORBY,** Senior Judge, and **TYMKOVICH**, Circuit Judges.

---

## I. Introduction

William Blind appeals his conviction of eight counts of embezzlement and theft from an Indian tribal organization in violation of 18 U.S.C. § 1163 and his resulting sentence. He argues there was insufficient evidence to sustain his convictions and that the district court erred in calculating the amount of loss for the purposes of sentencing, including restitution. Exercising jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, this court **AFFIRMS** the judgment

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of conviction and **AFFIRMS** the sentence except as to restitution. The order of restitution is **REVERSED** and the matter is **REMANDED** for resentencing only as to restitution.

## II. Background

The Cheyenne and Arapaho Tribes ("Tribes") operate a single government. Under the Tribes' Constitution in effect at all relevant times, the voting members of the Tribes were divided into six districts. Four Cheyenne districts elected one Business Committee member each and two Arapaho districts elected two members each. The Business Committee members were the highest-ranked elected officials, running the Tribes' government and business activity. Blind was an elected member of the Business Committee, representing the Arapaho 1 District ("A-1 District"). Blind's wife and co-defendant, Vinita Sankey, was also a Business Committee member representing the A-1 District.

The tribal government administered programs primarily with funding received from the federal government and, more recently, with revenues from its operation of casino gaming venues. The use of federal funds was closely monitored by the Bureau of Indian Affairs ("BIA") because the Tribes had been placed on "high risk" status based on mismanagement. The Tribes' expenditure of gaming revenues was governed by the Indian Gaming Regulatory Act ("IGRA") and monitored by the National Indian Gaming Commission, rather than the BIA. Under IGRA, profits from gaming may only be spent in five ways: 1) to

fund tribal government; 2) to provide for the general welfare of the Tribes; 3) to promote economic development; 4) to make charitable contributions; and 5) to assist local governments with their operations. 25 U.S.C. § 2710(b)(2)(B).

At the outset, gaming revenue was directed to the Tribes' finance office, which was a central office that processed checks for all Business Committee members. Tribal checks, however, sometimes bounced. As a remedy, the Business Committee passed a resolution directing the gaming revenues to be apportioned and transferred directly to each district representative for administration. Thereafter, Business Committee members, including Blind, had complete control over the gaming revenues apportioned to them for their districts. Gaming revenues funded, among other things, the Emergency Assistance ("EA") program, which provides financial assistance to tribal members for food, utilities, and other specified emergency needs. The EA program was designed to comply with the IGRA and a tribal resolution specified that checks for the disbursement of EA funds were to be made out only to the vendor of services for which the check was issued. There was high demand for EA funds because most tribal members were extremely poor.

In addition to the IGRA's and BIA's restrictions on the use of gaming and federal funds, respectively, the Tribes had adopted many of their own procedures and policies designed to prevent fraud or abuse, which applied to all tribal expenditures. One such policy involved a resolution adopting the General

Services Administration's guidelines for travel authorization and reimbursement requests. The Tribes also adopted procurement procedures under which purchases under $200.00 did not require a bidding process, purchases between $200.00 and $500.00 required three quotes from vendors, purchases between $500.00 and $5,000.00 required a more formal bidding process, and purchases over $5,000.00 required a sealed bidding process. Purchases in excess of $15,000.00 also required approval of the Tribal Council, a group that consisted of all adult tribal members.

In 2004, the FBI began investigating the use of gaming revenues by Business Committee members. As a result of that investigation, Blind and Sankey were indicted on conspiracy and embezzlement charges. Count One of the indictment charged Blind and Sankey with conspiracy to embezzle tribal monies. Counts Two through Six charged Blind with embezzling tribal funds by engaging in the practice of negotiating cashier's checks intended for his district by depositing only a portion of each check in the district's account and receiving a portion back in cash. Counts Nineteen, Twenty-One, and Twenty-Two charged Blind with purchasing automobiles with tribal funds and failing to return them to the Tribes upon leaving office. Count Twenty-Four charged Blind and Sankey with embezzling computer equipment.

At the close of evidence, Blind moved for a judgment of acquittal on all counts, arguing there was insufficient evidence to sustain a guilty verdict. The

district court denied the motion in its entirety, and the jury convicted Blind on all counts in the indictment except the count concerning embezzlement of a computer. A Presentence Report ("PSR") was prepared and it calculated the amount of loss at $216,538.14. Blind objected to some of the items included in that total and the district court addressed the objections at the sentencing hearing. The court overruled some of Blind's objections and sustained others, ultimately reducing the loss amount for guidelines calculation purposes to $171,041.71. Based on this amount, Blind's base offense level of six was increased by ten levels. *See* USSG § 2B1.1(b)(1)(F). His total offense level of sixteen and criminal history Category I resulted in an advisory guidelines range of twenty-seven to thirty-three months. The court sentenced him to thirty-three months' imprisonment, the high end of the range. The court also ordered Blind to pay $121,373.97 in restitution. On appeal, Blind challenges the sufficiency of the evidence supporting his convictions for Counts Two through Six, Nineteen, Twenty-One, and Twenty-Two, and corresponding denial of his motion for acquittal; the district court's calculation of the loss at sentencing which was used to increase his base offense level; and the district court's calculation of the amount of restitution.

## III. Discussion

### A. Sufficiency of the Evidence

This court reviews de novo whether the evidence was sufficient to allow a rational jury to find a defendant guilty beyond a reasonable doubt. *United States v. Flanders*, 491 F.3d 1197, 1207 (10th Cir. 2007). In so doing, however, all evidence must be viewed in the light most favorable to the government and reasonable inferences drawn in its favor. *Id.* An adverse ruling on a motion for a judgment of acquittal is also reviewed de novo, using the standard that applies to sufficiency challenges. *United States v. Apperson*, 441 F.3d 1162, 1209 (10th Cir. 2006).

### 1. Cashier's Checks

Blind first challenges his convictions on Counts Two through Six, which charged him with embezzling money from the Tribes by retaining cash totaling $14,468.87, representing portions of negotiated cashier's checks intended for the district. Blind admits the money was tribal money, but argues the government failed to present any evidence the cash he received was used for anything other than lawful tribal expenditures.

To prove the allegations in these counts, the government presented bank records of the cashier's check transactions. As to Count Two, the records showed Blind cashed a cashier's check payable to "Cheyenne & Arapaho - Arapaho Dist. 1 William Blind" in the amount of $16,373.87, in return receiving $4,995.00 in cash and a new cashier's check in the amount of $11,373.87 payable to the same payee. As to Count Three, the records showed Blind cashed the new cashier's

check for $11,373.87, receiving $2,400.00 in cash and a new cashier's check for $8,973.87. As to Count Four, the records showed Blind cashed the $8,973.87 cashier's check, depositing $5,000.00 into the A-1 District payroll account and taking $3,973.87 in cash.

As to Count Five, the records showed Blind cashed a cashier's check for $6,383.88, made payable to "C & A Arapaho District 1 William Blind," from which $2,000.00 was deposited into the payroll account, $1,500.00 was taken in cash, and the remaining $2,878.88 was used to purchase a new cashier's check. Finally, as to Count Six, the records showed Blind cashed the last cashier's check for $2,878.88, taking $1,600.00 in cash and purchasing a new cashier's check with the remaining $1,273.88. The government did not present any direct evidence of how Blind spent the cash he retained from these transactions.

Blind contends there was insufficient evidence to convict him of converting the cash for improper or personal use. Specifically, he argues the cashier's check transactions were not themselves secretive or illegal in nature. Additionally, he argues the government's case against him was undermined by witnesses who testified cash was often used by Blind's district for a variety of legitimate tribal functions, including emergency assistance, office expenses, and advances for trips. Witnesses also explained that cash transactions were necessary in light of the Tribes' troubled financial history because many local businesses would not

take tribal checks. Finally, Blind argues there was no evidence he lived an extravagant lifestyle or had an expensive vice.

Blind's arguments ultimately fail because, although he presents one way the jury could have viewed the evidence, it was not the only permissible view. Although there was no direct evidence presented at trial concerning Blind's use of the cash retained from the cashier's checks, there was sufficient circumstantial evidence to allow a jury to find he embezzled the cash. *See United States v. Davila*, 693 F.2d 1006, 1007 (10th Cir. 1982) (holding conviction can be founded on circumstantial evidence and that as to embezzlement, often only circumstantial evidence is available). The check-cashing scheme itself supports an inference of conversion. One bank employee testified Blind's actions were not "a normal way of doing business." In addition to being highly unusual, the transactions were structured in such a way as to foreclose tracing subsequent use of the cash obtained. The jury heard ample evidence of the Tribes' procedures and regulations designed to track tribal funds and ensure proper expenditures. In light of those policies, Blind's actions in structuring transactions in an inherently untraceable way supports an inference Blind's actions were designed to hide conversion of tribal funds. *See United States v. Baldridge*, 559 F.3d 1126, 1141 (10th Cir. 2009) (explaining that unusual nature of transactions designed to avoid detection can support a finding of an illegal intent). That Blind had access to and actually used a legitimate district bank account for some purposes, rather than

conducting all district business in this unusual fashion, further supports a reasonable inference that the cashier's check scheme was specifically structured to embezzle tribal money.

The essence of Blind's claim is that, since it is possible he used the cash for legitimate tribal purposes, the government was required to demonstrate specifically how he used the cash for his own private gain. This court has considered and rejected an identical argument before. In *Davila*, evidence that the defendant was reimbursed for travel vouchers that were implausible and sometimes falsified was sufficient circumstantial evidence the money was embezzled for defendant's own use, even though some other evidence suggested a plausible legitimate use. 693 F.2d at 1007. This court explained that "[f]or a case to meet the standard for sufficiency of the evidence it is not required that an appellate court exclude every reasonable hypothesis, but only that it find that a jury might reasonably have done so." *Id.*

Here, a jury might reasonably have excluded the possibility that Blind spent the money legitimately. Blind contends uncontested evidence showed cash was often used for legitimate district purposes such as the EA program. Although there was such evidence, there was also ample competing evidence introduced at trial. For instance, the Tribes' resolution concerning the use of EA funds specified "funds were to be used for limited purposes with proper documentation," and that "[a]ll checks will be made to the vendor only."

Witnesses testified that EA funds in Blind's district, however, were routinely distributed directly to tribal members and for purposes not enumerated in the EA resolution. While failure to follow tribal procedures for administering the EA program is not itself the conduct that forms the basis for the crime of embezzlement, the failure to follow established procedures may permissibly contribute to a finding that the cash was embezzled. Certainly, in light of conflicting evidence, the jury was not required to conclude Blind used the cash from the cashier's checks solely for legitimate district expenditures.

Blind's other arguments are likewise unpersuasive. Although Blind's lifestyle may not have been extravagant compared to some, there was evidence it was well above the standard in his community as demonstrated by the multiple buildings and vehicles on his property and his frequent travels. In short, the jury was presented with competing circumstantial evidence concerning Blind's use of the cash retained from the cashier's checks, and evidence supporting a finding of embezzlement was sufficient for a jury to convict Blind.

### 2. Tribal Vehicles

Blind next challenges the sufficiency of the evidence to support his convictions on Counts Nineteen, Twenty-One, and Twenty-Two, which involved the embezzlement of vehicles purchased with tribal funds. Blind argues there was insufficient evidence he converted the vehicles for his own personal use.

Count Nineteen concerned a 2002 Lincoln Town Car, which Blind purchased in the name of "Bill Blind & Cheyenne Arapaho Tribes of Oklahoma." Blind argues he legitimately purchased the Lincoln while a Business Committee member and returned it to the Tribes when he left office. He points to testimony that it was common practice for Business Committee members to purchase tribal automobiles. He further explains that he registered the vehicle under "Cheyenne and Arapaho Tribes, A-1," indicating it was a tribal, not personal, vehicle and that the vehicle was never registered or titled in his name alone. He also argues the purchase was not kept secret; Blind's successor on the Business Committee testified he knew Blind had purchased the car and that "everybody" knew it. Blind's successor also testified that after he took over Blind's position, he located the Lincoln at the Enrollment Department of the Tribes and took possession of it, using it until it was damaged in an accident. Blind also argues there was no evidence he used the Lincoln for purposes other than tribal business.

Again, Blind's argument rests on reading the evidence most favorably to him rather than, as we must, in the light most favorable to the government. The government presented sufficient evidence to support a jury finding that Blind embezzled the Lincoln. The manner in which Blind purchased the vehicle supports an inference that he purposefully acted in contravention of tribal policy. Blind purchased the car with five cashier's checks: two for $15,000.00, two for $2,000.00, and one for $379.00. From this evidence, a jury could find Blind

-11-

intended to circumvent the requirement that purchases over $15,000.00 be submitted to a full Tribal Council vote. An FBI agent testified that Blind told him the other Business Committee members agreed to his purchasing the Lincoln, but three other Business Committee members told the agent they knew nothing about the car. These facts support a jury finding that Blind intended to conceal the purchase of the Lincoln so he could use it for his own purposes rather than tribal business.

Evidence was also introduced that Blind's use of the vehicle was out of the ordinary. When Blind registered the Lincoln, Blind requested personal license plates, rather than an official tribal tag as other Business Committee members did for tribal vehicles. Evidence also indicated Blind had no legitimate tribal use for the vehicle. Blind's secretary testified he kept the purchase a secret from her and she never saw him drive the Lincoln. Another tribal official who knew Blind also testified she had never seen the Lincoln. That tribal employees who knew Blind never saw him use the Lincoln supports a jury finding that the car was purchased for personal, not tribal, use. Finally, the government presented evidence that when Blind was voted out of office, he did not return the Lincoln until the Tribes charged him in tribal court with embezzlement. Other Business Committee members returned tribal vehicles when they left office. This evidence, viewed as a whole, was sufficient to permit a jury to find Blind purchased the Lincoln with tribal funds but then converted it for his own personal use.

Count Twenty-One charged Blind and Sankey with embezzling a 2004 Chrysler 300M automobile. As to this vehicle, Blind titled and registered it in the name of "William Blind or Cheyenne Arapaho Tribes," which the dealer employee testified would allow either Blind or the Tribes to resell the vehicle. Like the Lincoln, the Chrysler was purchased with multiple cashier's checks, each under $15,000.00. In addition to the cashier's checks, a 2002 Dodge Intrepid belonging to the Tribes was traded in for a credit toward the purchase price. The dealer employee testified that the dealer did not go through a bidding process with the Tribes for the sale of the Chrysler. Again, like the Lincoln, Blind did not obtain an official tag for the car, but rather obtained a personal tag; on the Chrysler he even requested a personalized license plate reading "USNVET." He did not return the car when he left office. It was located at his residence by the FBI nearly two years later. This evidence, like the evidence concerning the purchase of the Lincoln, was sufficient for the jury to find the Chrysler, purchased with tribal money, was embezzled.

Blind argues the Tribes' name was always on the title of the Chrysler, and use of a personalized tag would have no effect on the ownership. He further argues there was nothing preventing the Tribes from coming to his residence and reclaiming the vehicle, and that his failure to return it was a political statement intended to protest his removal from office, which he viewed as illegitimate. Ultimately, Blind's position fails because, although he was certainly free to make

these arguments to the jury, nothing compelled the jury to credit his account instead of crediting the ample evidence indicating he embezzled the Chrysler.

Count Twenty-Two charged Blind and Sankey with embezzling a 2003 Dodge 1500 Quad Cab pickup truck. The Dodge was purchased and used in much the same way as the Lincoln and the Chrysler. As to the Dodge, Sankey purchased the truck with multiple cashier's checks; each was less than $15,000 and two were drawn on Blind's district account. No bidding process was used to purchase the vehicle. The car was titled and registered as "Vinita Sankey or Cheyenne Arapaho Tribe" and was tagged with a personal, rather than an official tag. When Sankey renewed the registration in 2004, she registered the truck solely in her name and obtained personalized license plates reading "T-WATER." Once Blind and Sankey left office, Sankey re-registered the pickup with the state in her own name, rather than with the tribal registration office. The pickup was not returned to the Tribes when Blind and Sankey left their positions with the Business Committee.

Blind argues Sankey purchased the vehicle, not him, and that his name was not on the title and there was no evidence he ever used it. He further contends the evidence showed that the Tribes always knew where the truck was located and the failure to return it was a political protest. Blind's arguments fail. Evidence was sufficient for a jury to find he was directly involved in the purchase of the Dodge: half the funds for the purchase price came from Blind's district account, Blind

signed some of the paperwork associated with the vehicle, and the vehicle was stored at Blind and Sankey's joint residence. Even apart from his direct involvement, the jury could have found him guilty based on his participation in a conspiracy. Blind and Sankey were charged with conspiracy to embezzle tribal funds, including by using tribal funds to purchase automobiles they did not return when they left office. The jury convicted Blind and Sankey of the conspiracy and specifically found them guilty of the act of embezzling vehicles. It is axiomatic that a coconspirator is liable for the foreseeable acts of the other conspirators in furtherance of the conspiracy. *See United States v. Gillis*, 942 F.2d 707, 711 & n.1 (10th Cir. 1991). For all of these reasons, there was sufficient evidence to sustain the jury's verdict on this count.

## B.  Blind's Sentence and Restitution Order

Blind challenges his sentence as procedurally unreasonable, arguing the district court erred in calculating the total amount of loss used to set his offense level under the sentencing guidelines. He further argues the district court erred in calculating the amount of restitution he was ordered to pay, incorporating by reference his arguments concerning the guidelines loss calculation. Factual findings of loss, when preserved by timely objection below, are reviewed for clear error. *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010). When a defendant challenges a loss amount in the PSR, the government bears the burden of proving that amount by a preponderance of the evidence. *United States v.*

-15-

*Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009). The district court's loss

calculations are entitled to deference under the guidelines, because it is in the best

position to estimate the loss based on the evidence before it. *See* USSG § 2B1.1

cmt. n.3(C) ("The sentencing judge is in a unique position to assess the evidence

and estimate the loss based upon that evidence."). Review of a restitution order

under the Mandatory Victims Restitution Act ("MVRA") is for an abuse of

discretion, although application of the MVRA is reviewed de novo and factual

findings for clear error. *United States v. James*, 564 F.3d 1237, 1242 (10th Cir.

2009). If a defendant fails to object to a restitution award before the district

court, the award is reviewed for plain error. *Id.* at 1242-43.

### 1. Cashier's Checks

First, Blind challenges the $31,351.55 amount of loss the district court

adopted from the PSR attributed to the cashier's check scheme. He argues that

$16,882.68 of this amount was not supported by any evidence at trial or

sentencing. As to the remaining $14,468.87, he argues the inclusion of that

amount, evidence of which was introduced at trial, was erroneous because

evidence did not show that he kept the cash for personal use, essentially

advancing the same arguments as he did in his challenge to the sufficiency of the

evidence supporting the cashier's check convictions.

Blind begins by arguing that, as a result of these alleged errors, the district

court used an incorrect loss amount to calculate his offense level. *See* USSG §

2B1.1(b)(1)(F). The government argues at length that because Blind failed to object to the amount of loss in the PSR attributable to the cashier's checks, the district court's fact-finding obligation was not triggered. *United States v. Rodriguez-Delma*, 456 F.3d 1246, 1253 (10th Cir. 2006) (explaining that a defendant must object to the accuracy of specific facts in the PSR to invoke the district court's fact-finding obligation); *see* Fed. R. Crim. P. 32. There is no need to decide whether Blind's objection to the loss from the cashier's check scheme was adequate, however, because, as explained below, any error was harmless because it did not affect his advisory guidelines range. *See United States v. Wilken*, 498 F.3d 1160, 1169 (10th Cir. 2007) ("Even where we find an error in calculating the Guidelines range, however, we need not vacate and remand the sentence if the error was harmless.").

The district court did not clearly err in including the $14,468.87 loss, evidence of which was introduced at trial and described above. For the same reasons Blind's sufficiency challenge as to the cashier's check convictions on Counts Two through Six fails, there was sufficient evidence for the district court to attribute that loss to Blind's conduct. As to the remaining $16,882.68, the government agrees on appeal there was no evidence to support that portion of the total loss amount and concedes it was improperly included. The district court, however, found Blind's total loss amount to be $171,041.71 and, under the guidelines, the same increase to a defendant's offense level applies to loss

-17-

amounts between $120,000.00 and $200,000.00.  *See* USSG § 2B1.1(b)(1).  Had

the district court not included the erroneous $16,882.58, it would not have

reduced Blind's total loss amount below the $120,000.00 cutoff for calculating his

total offense level.  Any error, even if Blind preserved his objection, was

therefore harmless as to Blind's advisory guidelines range.

Based on the same factual allegations concerning the cashier's checks in

the PSR, however, the district court also ordered Blind to pay $14,927.55 in

restitution.  Again, of that, $14,468.87 was based on evidence introduced at trial

and Blind's challenge to that amount is meritless for the reasons explained above.

The remaining $452.68, on the other hand, is a portion of the amount for which

the government concedes no evidence was presented.  Under the MVRA, a

restitution order that the government concedes exceeds the loss caused by the

defendant is an illegal sentence that satisfies the plain error test.  *James*, 564 F.3d

at 1243; *United States v. Smith*, 156 F.3d 1046, 1057 (10th Cir. 1998).  Thus,

even if Blind did not preserve his objection to the restitution amount, as the

government argues, the inclusion of the $452.68 in the total amount is plain error

because the government concedes it was unsupported by evidence.  *See Smith*,

156 F.3d at 1056 (vacating under plain error standard restitution amount as to

which government admits it did not present evidence below).  The restitution

order is therefore reversed as to the $452.68 amount attributed to a cashier's

check transaction.

## 2. Travel Reimbursements

Next, Blind challenges the inclusion of $11,635.46 in his total loss amount attributed to improper travel reimbursements from four separate trips.[1]  The government agrees Blind preserved his objection as to three of the trip-related losses but argues he failed to object to the amount related to the fourth trip.  As to the three reimbursement amounts to which Blind objected below, the government admits those amounts were erroneously included as the government did not present evidence to support them.

As to Blind's challenge to the calculation of his advisory guidelines range, even assuming he properly objected below, any error is harmless.  If Blind's loss amount was reduced to $142,523.57 by deducting both the $11,635.46 from travel reimbursements and the $16,882.68 of cashier's check losses for which there was no evidence, Blind's total loss amount is still well above the $120,000.00 cutoff used to calculate his offense level.

For the purposes of restitution, however, the government's concession that no evidence supported three of the four travel reimbursement amounts requires reversing the restitution award as to those trips.  Although the government did not expressly concede a lack of evidence as to the fourth trip, instead arguing the issue was not preserved for appellate review, it identified no record evidence

[1]The travel reimbursements were listed as pertaining to the National Indian Education Conference, the Bingo World Conference, the National Congress of American Indians, and the Global Gaming Expo.

supporting the trip's inclusion and none is apparent from the sentencing transcript. Thus the district court plainly erred by ordering Blind to pay $11,635.46 in restitution and the district court's restitution order as to that amount must be reversed. *See id.*

### 3. Wire Transfer

Blind challenges the district court's inclusion of $8,339.00 in losses attributed to a wire transfer of tribal funds to Las Vegas where he was attending a training program. This loss amount was based on a manner and means allegation in the conspiracy charge of the indictment, which alleged Blind "caused $8,000.00 in tribal funds to be wire transferred from El Reno, Oklahoma, via Western Union to Las Vegas, Nevada on January 28, 2003, for additional expenses for [himself] and others."[2] Blind argues the district court's inclusion of this loss amount was clearly erroneous because the jury did not specifically identify which of the manner and means allegations substantiated the conspiracy conviction and because evidence connected Sankey, but not him, to the fund transfer.

Contrary to Blind's assertion, however, the jury's verdict form not only convicted Blind of the conspiracy count generally, but also included a special verdict in which the jury unanimously found Blind had committed the specific

---

[2]Evidence at trial showed the additional $339.00 represented the transfer fee for the funds.

acts alleged in the indictment, including the wire transfer. Furthermore, evidence presented at trial was sufficient to support a finding that Blind was responsible for this loss, including evidence that Blind was present when Sankey suggested the transfer and that he received a portion of the money. Accordingly, the district court's finding of loss as to the wire transfer based on the trial evidence and jury's verdict was not clearly erroneous and its inclusion of that amount for guidelines and restitution purposes was not error.

### 4. Tribal Vehicles

Blind further challenges the loss amount with respect to the vehicles purchased with tribal funds. The district court used the value of the Chrysler at the time Blind left office as the loss amount attributed to that vehicle for guidelines and restitution purposes. Blind first argues the district court erred in using the full purchase prices of the Lincoln and the Dodge pickup to determine those loss amounts, rather than their values at the time he left office as it did for the Chrysler.[3] Blind further argues the Lincoln was used for tribal purposes

---

[3]Blind makes an oblique reference in his brief to three vehicles whose full value was counted toward his total loss amount, in addition to the Chrysler's partial value. Blind names the Lincoln and the Dodge pickup as two of the three, but fails to identify the third vehicle in his opening brief. Although the government assumes the third vehicle is a Dodge Intrepid, which was traded into the dealership for a credit toward the purchase of the Chrysler, the Dodge Intrepid was not in Blind's possession at the time he left office and it is therefore unclear how Blind believes its value should have been calculated. Given that Blind does not even identify the vehicle whose value he challenges until his reply brief, and never makes any argument as to how the district court erred specifically with

(continued...)

during his time in office and that it was returned to the Tribes prior to the indictment in this case. He therefore contends that no amount of loss should be attributed to the Lincoln.

The district court, however, assessed the loss attributable to the two vehicles as their initial purchase prices based on its finding that neither vehicle was purchased for or used for tribal purposes, but rather was purchased with the intent to deprive the Tribes of full use from the outset. This finding is not clearly erroneous, as there was evidence the vehicles were purchased in a covert manner and against tribal policy, they were titled and registered in a way designed to hide their ownership by the Tribes, individuals who knew Blind never saw him or Sankey use these vehicles, and the Lincoln was returned only after Blind was charged with embezzlement in tribal court. Given this last uncontested fact, the district court was certainly justified in not deducting any residual value under the guidelines for the returned Lincoln, as such credit applies only if a defendant returns property "before the offense was detected." *See* USSG § 2B1.1 cmt. n.3(E)(i).

---

[3](...continued)
respect to its valuation, Blind has presented inadequate appellate argument to preserve review of the loss calculation as to the third vehicle. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("This Court will not consider such 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation'").

Blind separately asserts the district court misapplied the MVRA in failing to deduct from the restitution amount the value of any property returned or returnable to the Tribes. Under the MVRA, a district court can either order a defendant to return the property which caused the loss or, if return is "impossible, impractical, or inadequate," to pay the full value of the property "less the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1). Blind argues that under this provision, because the Lincoln was returned to the Tribes, either no restitution should have been awarded as to it, or its value to the Tribes at the time of return should have been deducted from the amount of restitution. He further asserts the district court should have considered whether the Chrysler or Dodge pickup could be returned and their present value deducted from the restitution amount.

Blind wholly failed to raise these objections and arguments before the district court. Although he objected to the inclusion of the value of the cars for purposes of the loss calculations, he raised only the argument that the relevant value was the value of the automobiles on the date he left office, rather than their purchase price, which was addressed above. He never argued that the district court should have ordered the return of the vehicles or deducted their residual value upon return from the calculations. Accordingly, this court reviews the district court's application of the MVRA for plain error. *See James*, 564 F.3d at 1242.

As to the Chrysler and Dodge pickup, it is undisputed that neither was returned. The MVRA instructs the district court either to order return of property or, if return is impossible, impractical, or inadequate, to order payment of restitution. 18 U.S.C. § 3663A(b)(1). By ordering a payment of restitution, the district court implicitly determined that return of the Chrysler and Dodge pickup was impossible, impractical, or inadequate. Although Blind points to evidence suggesting return of the vehicles might have been possible some years prior to his trial when a federal investigator located them on his property, Blind identifies no evidence in the record that return of these vehicles was possible, practical, or adequate *at the time of sentencing*. *See* 18 U.S.C. § 3663A(b)(1)(A) (contemplating return of property as occurring after entry of a restitution order). Accordingly, Blind cannot demonstrate the district court plainly erred in its restitution order as to those two vehicles.

As to the Lincoln, it is undisputed that it was returned. The value of property for which a defendant owes restitution is a factual issue. *See United States v. Overholt*, 307 F.3d 1231, 1253 (10th Cir. 2002). The PSR set forth value of the Lincoln used to calculate the restitution Blind owed the Tribes. When a defendant fails to raise an objection at sentencing to a factual assertion in the PSR, there is no factual dispute requiring further resolution by the district court. *Id.*; *see also United States v. Barton*, 366 F.3d 1160, 1166 (10th Cir. 2004) ("Where . . . the PSR recommends restitution under the MVRA for an actual

-24-

recoverable loss incurred by a victim of the defendant's crime, and the defendant does not object to that request, there is no need under the MVRA for a district court to engage in any additional fact finding with respect 'to the proper amount or type of restitution,' 18 U.S.C. § 3664(e)."); *United States v. Johnson*, 183 F.3d 1175, 1179 (10th Cir. 1999) (explaining that by "failing to challenge the court's [restitution] order on the grounds he now raises, Defendant stripped the district court of its ability to make findings"). In such circumstances, adopting the facts in the PSR will not constitute plain error. *Overholt*, 307 F.3d at 1253; *see Rodriguez-Delma*, 456 F.3d 1246, 1254 (holding when a defendant fails to allege any factual inaccuracy in the PSR, "it [is] not error for the district court to adopt the uncontested facts in the PSR"). Moreover, even if the failure to reduce the restitution attributed to the Lincoln by its value at the time of return was erroneous, Blind has pointed to no evidence, much less uncontested facts, in the record establishing the value of the Lincoln at that time and therefore cannot demonstrate he was prejudiced. *See James*, 564 F.3d at 1242 (under plain error review, defendant must demonstrate "clear or obvious error that affected his substantial rights, and that seriously affected the integrity of the judicial proceedings").

### 5. Computer Equipment

Finally, Blind argues the district court's finding of a $2,986.86 loss attributable to computer equipment is clearly erroneous because the jury acquitted

him of that charge. The district court concluded the evidence presented at trial was sufficient to find the computer equipment purchase attributable to Blind. That finding is not clearly erroneous. There was testimony at trial that: Blind instructed his secretary to purchase the computer equipment, he did not follow established procurement procedure, the equipment was delivered to Blind, and it was never seen at the district office thereafter. Even if the loss related to the computer equipment was erroneously included in the total loss, however, that error would be harmless as, even if combined with other errors described above, it would not decrease the total loss sufficiently to change Blind's offense level. *See* USSG § 2B1.1(b)(1). This loss amount was, moreover, not included in Blind's order to pay restitution.

## V. Conclusion

For the forgoing reasons, Blind's convictions are **AFFIRMED**, his sentence is **AFFIRMED** except as to restitution, and the restitution order is **REVERSED**. The matter is **REMANDED** for resentencing as to restitution only.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge